[No. 34974.  *En Banc.*  November 27, 1959.]

THE AUTOMOBILE CLUB OF WASHINGTON *et al., Respondents,*
v. THE CITY OF SEATTLE *et al., Appellants.*[1]

[1]Reported in 346 P. (2d) 695.

*A. C. Van Soelen* and *A. L. Newbould,* for appellants.

*Arthur J. Lambo,* for respondent Automobile Club.

*The Attorney General* and *Douglas Hartwich, Assistant,* for respondents Bugge *et al.*

DONWORTH, J.—This action was initiated by the Automobile Club of Washington, Inc., one of the respondents herein, as a taxpayer, against appellants, the city of Seattle and its comptroller and treasurer, seeking (1) a declaratory judgment to the effect that the transfer of funds from the "city street fund" to the emergency fund for the purpose of paying a certain death and bodily injury judgment rendered against the city, by reason of the negligence of its bridge tenders in the operation of the Montlake bridge,

was an unconstitutional diversion of state gasoline excise tax funds, being in violation of the eighteenth amendment to the state constitution; and (2) a writ of mandamus compelling appellant to reimburse the "city street fund" from the general fund for any moneys transferred therefrom pursuant to the provisions of ordinance No. 83598, and used by appellant to satisfy the tort judgment above referred to.[2]

The case was originally tried in the superior court for King county, which held that the transfer of funds was lawful and dismissed the action.

The Automobile Club then appealed to this court, and we set aside the judgment of the trial court and remanded the cause with instructions to cause the director of highways of the state of Washington to be made a party defendant. See *Automobile Club v. Seattle,* 49 Wn. (2d) 262, 300 P. (2d) 577 (1956).

Accordingly, the Automobile Club filed an amended complaint containing essentially the same allegations, except that venue was changed to the superior court for Thurston county, and the director of highways and the highway commissioners of the state of Washington were made parties to the action.

The case was tried to the court, sitting without a jury, upon stipulated facts and resulted in the court's concluding, as a matter of law, that the use of moneys in the city street fund to reimburse the city's general fund for the payment of the tort judgment was an improper charge against the city street fund and constituted an illegal and unconstitutional diversion thereof.

The attorney general appeared in the trial court on behalf of the state officials named as respondents herein. On this appeal, he submitted a brief and participated in the oral argument in support of the position taken herein by respondent Automobile Club.

---

[2]In its brief on the present appeal the Automobile Club has abandoned its prayer for mandamus since it believes that the declaratory judgment will afford it adequate relief.

The city of Seattle (hereafter referred to as appellant) has taken this appeal and presents three assignments of error. Since assignments No. 2 and No. 3 are substantially the same as assignment No. 1, we shall refer to only the first assignment of error, which reads as follows:

"That the trial court erred in concluding that the payment of the judgment in the case of *Perrigo v. City of Seattle* was an improper charge against the City Street Fund and constituted an illegal and unconstitutional diversion of said fund."

The case was tried upon a written stipulation of facts entered into by the parties hereto, which states in part:

"V. That on or about November 15, 1954, in the case of Joyce P. Perrigo, individually and as Administratrix of the Estate of Leonard A. Perrigo, deceased, and Guardian ad Litem of Mark P. Perrigo, a minor, vs. City of Seattle, King County Cause No. 471293, a judgment was rendered against the city and in favor of the plaintiff for the death of Leonard A. Perrigo, injuries to Joyce P. Perrigo and to her minor child by reason of a collision with the south leaf of the Montlake Bridge in the City of Seattle on March 18, 1954. That the Montlake Bridge is a movable span bridge within the city limits of Seattle, is a part of the city street and the state highway system and the operation of said span bridge is a 'highway purpose' within the 18th Amendment to the State Constitution; that the City of Seattle, acting for and in behalf of the state, operates and maintains said bridge and employs bridge tenders to operate said movable span bridge and is reimbursed by the state therefor, all pursuant to a written contract between the city and the state dated March 27, 1953, and authorized by Ordinance No. 81863, copy of which agreement is marked Exhibit 'A', attached to this stipulation and by this reference is made a part thereof. That the maintenance of said bridge was at the time of the accident giving rise to the judgment upon the payment of which this action is brought provided for by a special maintenance contract between the City of Seattle and the State of Washington, a copy of which is attached hereto and designated as Exhibit 'B'.

"That the accident which gave rise to the aforesaid judgment arose out of the raising of the south leaf or span of said Montlake Bridge, without any warning, by bridge tenders employed by the city as aforesaid who were, in the

course of their employment, testing the operation of said leaf for defects.

"VI. That the City of Seattle passed Ordinance No. 83598, entitled:

" 'An Ordinance making an appropriation from the Emergency Fund to the Judgment Fund, reimbursable from the City Street Fund, to pay the judgment against the city in King County Cause No. 471293 (Montlake Bridge case); and declaring the emergency therefor.' "

Pursuant to the above ordinance, appellant provided funds for the payment of the Perrigo judgment, in the amount of $118,585 (plus costs), by appropriating this sum from its emergency fund to its judgment fund and then reimbursing the emergency fund from the city street fund. Thus, the Perrigo judgment was, in effect, paid from the city street fund. If appellant should be held liable for wrongful diversion of moneys from this fund, the ultimate source of payment would be the city's general fund.

It is to be noted that there is no question as to appellant's liability for the Perrigo judgment. In fact, no appeal was taken by the city to this court therefrom.[3] The only question involved in the present case is whether the payment of such judgment from the city street fund violates the constitution of this state.

The city street fund was created by RCW 47.24.040, which reads:

"All funds accruing to the credit of incorporated cities and towns in the motor vehicle fund shall be paid monthly to such cities and towns and shall, by the respective cities and towns, be placed in a fund to be designated as 'city street fund' and disbursed as authorized and directed by the legislative authority of the city or town, as agents of the state, for salaries and wages, material, supplies, equipment, purchase or condemnation of right of way, engineering or any other proper highway or street purpose in connection with the construction, alteration, repair, improvement or maintenance of any city street or bridge, or viaduct or underpassage along, upon or across such streets. Such

---

[3]Litigation between parties interested in the judgment was decided by this court in *In re Perrigo's Estate*, 47 Wn. (2d) 232, 287 P. (2d) 137 (1955).

expenditure may be made either independently or in conjunction with any federal, state or any county funds."

■ Thus, the money in the city street fund is derived from the motor vehicle fund, which is the special fund created by the eighteenth amendment to the state constitution, adopted by the people in 1944. The material portion of the amendment provides:

"All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:

"(a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets;

"(b) The construction, reconstruction, *maintenance*, repair, and betterment of public highways, county roads, *bridges* and city streets; *including the cost and expense of* (1) acquisition of rights-of-way, (2) installing, maintaining and operating traffic signs and signal lights, (3) policing by the state of public highways, (4) *operation of movable span bridges*, (5) operation of ferries which are a part of any public highway, county road, or city street; . . ." (Italics ours.)

■ The amendment was designed to insure that the motor vehicle fund would be used exclusively for highway purposes. *State ex rel. Bugge v. Martin*, 38 Wn. (2d) 834, 232 P. (2d) 833 (1951).

Appellant contends that payment of the Perrigo judgment is for a "highway purpose" because it is a part of the "cost and expense of . . . [the] operation of movable span bridges," as that language is used in the eighteenth amendment. It is asserted that it cannot be logically argued that the cost and expense of a personal injury verdict arising out of the operations of a movable span bridge is any less a "cost and expense" to the city of the "operation of movable span bridges" than the "cost and expense" of

payrolls, electric energy, cleaning, or any other activities directly related to the operation of such bridges.

Appellant cites various cases from other jurisdictions to the effect that personal injury claims and claims for loss or damage to freight shipments against railroads are properly classed as operating and maintenance expenses of the railroad.

■ Such cases are of no value in solving the problem before us. We are not dealing with costs and expenses as an accounting concept. Rather, we are here confronted with a constitutional limitation adopted by the people, which is to be understood as their words used in their ordinary meaning and not in any technical sense.

Appellant relies most strongly on *State ex rel. King County v. Murrow,* 199 Wash. 685, 93 P. (2d) 304 (1939) (decided prior to the adoption of the eighteenth amendment), where we held that county ferries leased to and operated by a private party were a part of the county road system, and that the premiums payable on accident and fire insurance policies covering the ferries were a proper maintenance expense, reimbursable out of the county's allocation of the state motor vehicle fund. These insurance premiums were held to be a proper maintenance expense because they guaranteed the repair or replacement of the ferries in the event of damage or destruction. The question of public liability insurance was not before the court, and we do not think that the holding of that case could reasonably be extended to apply to such insurance, as evidenced by the following quotation:

"We agree with appellant that no fine line of distinction should be drawn between the actual *physical repair, construction,* or *maintenance* of a ferry boat and the purchase of insurance so that such *vessels* can be repaired or replaced in the event of loss through *fire* or *hazards* of navigation." (Italics ours.)

The only foreign case relied upon by appellant which appears to have any bearing upon the question before us is *Keck v. Manning,* 313 Ky. 433, 231 S. W. (2d) 604 (1950).

That case involved the antidiversion amendment of Kentucky's constitution relating to highway funds, which reads as follows:

" ' . . . No money derived from excise or license taxation relating to gasoline and other motor fuels, and no monies derived from fees, excise or license taxation relating to registration, operation, or use of vehicles on public highways shall be expended for other than the cost of administration, statutory refunds and adjustments, payment of highway obligations, costs for construction, reconstruction, rights-of-way, maintenance and repair of public highways and bridges, and expense of enforcing state traffic and motor vehicle laws.' "

The supreme court of Kentucky held that expenditures by the highway department for printing and distributing road maps, booklets, photographs, and advertisements of the state's highways in motor magazines did not contravene the antidiversion amendment of the Kentucky constitution, above quoted. In the course of its decision, the court pointed out that such material played an important role in directing and distributing traffic safely over the state's highways and thereby directly contributed to the maintenance and administration of the highway system. In speaking of the intent of the framers of its constitutional amendment, the court stated:

"The purpose of the 1944 amendment, often referred to as the 'anti-diversion amendment,' was not to *curtail* the road program but to make secure the funds with which to continue it. . . . Manifestly, it was not the intention of the amendment to *impede* the department in insuring the road fund, or increasing it, by the publication and distribution of information concerning our highways."

██ ██ Likewise, in the case at bar, it was not the intent of the people, in adopting the eighteenth amendment, to *curtail* or *impede* the road program of this state. On the contrary, we think it was the intention of the people to limit expenditures from the motor vehicle fund to those things which would directly or indirectly benefit the highway system. Clearly, the payment of a tort judgment does not fall within this category. Such an expenditure could in no way

contribute toward the safety, administration, or operation of our highway system, but, rather, would establish a precedent that could result in substantially decreasing those funds reserved for such purposes. This, we feel, would be a detriment rather than a benefit to our highway system.

It appears that the courts of last resort of only two states, Minnesota and Louisiana, have had occasion to pass upon the question presented in this case, to wit, whether a personal injury judgment may be paid out of funds which are limited by constitutional provision to disbursements for highway purposes. Both these courts held that such an expenditure would violate their respective state constitutions.

We think the Minnesota case of *State ex rel. Wharton v. Babcock*, 181 Minn. 409, 232 N. W. 718 (1930), is directly in point here. There, the Minnesota legislature had passed a statute directing the commissioner of highways to pay out of the trunk highway fund to divers persons certain sums of money as damages for personal injuries and property damage caused through the negligence of the employees of the state department of highways. Section 10 of the statute provided for payment of $2,700 to the petitioner, Emma Wharton, the widow of Clyde Wharton, whose death was caused as the result of the negligent maintenance of a bridge and approach thereto by the highway department on trunk highway No. 9. The commissioner of highways refused to make the payment and a mandamus action was brought to compel him to do so. In holding that such a payment would be an unlawful diversion of highway funds, the court stated:

"In 1920 the trunk highway amendment to the constitution, as art. 16, was adopted. Section 1 provides:

" 'There is hereby created and established a trunk highway system, which shall be located, constructed, reconstructed, improved and forever maintained as public highways, by the state of Minnesota.'

"Section 2, besides providing for a sinking fund to pay the principal and interest of any bonds issued for the purposes stated in § 1, creates a fund to be known as the trunk highway fund. The money in these funds is to consist of the proceeds of the tax to be imposed on motor vehicles. The section further provides:

" 'The trunk highway fund shall be used solely for the purposes specified in section 1 of this article, and when duly authorized by legislative enactment to reimburse any county for the money expended by it subsequent to February 1st, 1919, in permanently improving any road hereinbefore specifically described.' . . .

"The specific question presented for review is whether the provision of art. 16, § 2, of the constitution, that the trunk highway fund shall be used solely for the location, construction, reconstruction, improvement and maintenance of the trunk highways of the state, so limits the power of the legislature that it cannot appropriate money out of that fund to pay damages to one injured in his person or property as a result of negligence on the part of the highway department in maintaining a trunk highway.

"Article 16 of the constitution is not an act of the legislature but an act of the people or electors of the state. If the meaning of any word, sentence, or section thereof is in doubt and search is to be made as to the intent of the lawmakers, we must go back to search for the intent of the electors of the state. A search of that kind may not be of great value. Neither do we hold that there is any serious doubt to be here resolved. But a brief consideration of the situation may not be out of place. The people of the state desired better highways. They created a fund for the purpose of locating, building, improving, and maintaining such highways. To protect and preserve that fund and make certain that it should be used only for the purposes stated, they placed in the article a specific limitation that the fund should be used solely for the purposes stated. The language used is clear and limits the power of the legislature, as well as all other persons, in the use of the fund. It has always been the law here that the state is not legally liable for the negligence of any official or agent in the maintenance of highways. To hold that in adopting art. 16 the people intended that subsequent legislatures might use the trunk highway fund to pay damages for injuries to persons and property upon such highways, where there was no legal liability, however laudable the purpose, would be going far afield. . . .

"It is argued that compensation for injuries caused by negligence of the highway department or its employes is so clearly related to the construction and maintenance of the trunk highways that it may be considered in the nature of an expenditure for such purposes and properly paid out of the trunk highway fund. We are unable so to hold. While it may

create a moral obligation on the part of the state, such expenditure in no way or degree furthers or contributes to the construction or maintenance of the highways."

See, also, *State ex rel. Varnado v. Louisiana Highway Comm.*, 177 La. 1, 147 So. 361 (1933); *Mallard v. State* (La.), 194 So. 447 (1940).

We have quoted extensively from the *Babcock* case, *supra*, because we think the language therein is directly applicable to the case at bar.

The state of Washington enjoys complete sovereign immunity for the tortious acts of its employees. *Riddoch v. State*, 68 Wash. 329, 123 Pac. 450 (1912). We do not think it was the intent of the people, in adopting the eighteenth amendment, to indirectly waive such immunity by permitting a city to compel the state to reimburse it for expenditures made by the city (on the theory that they are incurred for a highway purpose) to satisfy personal injury judgments rendered against it.

The obligation of the state here, as in the *Babcock* case, *supra*, is a moral one, while that of the city is a legal one. *Sutton v. Snohomish*, 11 Wash. 24, 39 Pac. 273 (1895); *Bradshaw v. Seattle*, 43 Wn. (2d) 766, 264 P. (2d) 265, 42 A.L.R. (2d) 800 (1953), and cases cited therein. However, regardless of which governmental body ultimately bears the burden of satisfying the Perrigo judgment, it must do so from funds other than the motor vehicle fund, since such an expenditure has no relation to the *construction, operation, maintenance,* or *betterment* of the public highways or bridges as those terms are used in the eighteenth amendment.

The judgment of the trial court is affirmed.

WEAVER, C. J., MALLERY, HILL, ROSELLINI, and OTT, JJ., concur.

FOSTER, J. (dissenting)—I dissent.

Until today, it has been undetermined whether payment for damages resulting from negligent operation of a highway

constitutes an operating expense under the constitution and statutes, and payable from the motor vehicle fund.

Although under the prevailing doctrine of sovereign immunity the state is not liable for torts, for many years the state has insured its vehicles and highway equipment. An Associated Press dispatch of October 2, 1959, reported that the annual premium on casualty insurance covering state vehicles for the calendar year ending October 1, 1959, was $239,000, and that a reduction of $40,000 in the premium for the ensuing year had been obtained. For many years highway department officials have inquired if the state could legally insure against such liability, and the opinions of succeeding attorneys general have been in the affirmative. Attorney General Hamilton advised:

"The supreme court of the state in several cases has held that the state is not liable for the negligence of its employees and officers. While this is the law, and is as it should be, that is no reason why the state should purchase automobiles to be used for its employees and send them over the highways in the state to administer and care for the state business without some insurance for liability as well as property damage in case of injury to persons on the highways, whether by reckless driving or otherwise.

"In our opinion, the state should carry liability as well as property damage insurance on all these state cars *to protect the innocent public against injury by careless employees* and pay the premiums for such insurance." (Italics mine.) 1935-36 Opinions of the Attorney General 68.

This was but a reiteration of the view of Attorney General Dunbar (1931-1932 Opinions of the Attorney General 139, 140), who labeled as "a rather technical view of the situation" the argument that the use of funds for such purpose would amount to a gratuity, and concluded that such use was proper. Attorney General Hamilton agreed (1939-1940 Opinions of the Attorney General 190).

These views have been followed ever since. Liability insurance on state equipment is for public protection. The highway department has properly paid such premiums from the motor vehicle fund as an operating expense. I perceive

no difference between payment of liability insurance premiums and direct payment of damage. Both protect the public.

Furthermore, this court in *State ex rel. King County v. Murrow,* 199 Wash. 685, 93 P. (2d) 304, defined the word "maintenance" quite broadly to include all acts appropriate to operating an efficient highway system.

Attorney General O'Connell advised (1958 Opinions of the Attorney General, No. 221) that certain expenditures of the state patrol could properly be paid from the motor vehicle fund, and stated that the enumeration of specific purposes in amendment 18 of the Washington constitution has been construed as not limiting the scope of the term "highway purposes," but rather as enlarging and extending it. He cited *State ex rel. Bugge v. Martin,* 38 Wn. (2d) 834, 232 P. (2d) 833. Attorney General O'Connell concluded:

"In the enactment of the constitutional amendment in question, we believe that the people considered it important not only to construct and maintain highways but to provide that they be policed *in the interest of their safe use.* . . ." (Italics mine.)

Such is the purpose both of payment of premiums and of payment for damages sustained.

In my view, then, the judgment should be paid from the motor vehicle fund. I would reverse the judgment.

FINLEY and HUNTER, JJ., concur with FOSTER, J.