[No. 40476.    En Banc.    March 20, 1969.]

THE STATE OF WASHINGTON, *on the Relation of John J. O'Connell, as Attorney General, Respondent,* v. RICHARD H. SLAVIN, *Appellant.**

*Reported in 452 P.2d 943.

*The Attorney General, Edward Starin, Special Assistant,* and *Robert N. Gates, Jr., Assistant,* for appellant.

*The Attorney General, Thomas R. Garlington, Special Assistant,* and *Delbert W. Johnson, Assistant,* for respondent.

ROSELLINI, J.—This is an action for declaratory judgment to determine the constitutionality of an appropriation contained in chapter 143 of the Laws of 1967, Extraordinary Session. The appropriation is in the amount of $250,000, and was provided in the following language:

PLANNING AND COMMUNITY AFFAIRS AGENCY

Motor Vehicle Fund Appropriation to assist metropolitan municipal corporations to make the planning, engineering, financial and feasibility studies incident to the preparation of a comprehensive public transportation plan; it is the intent of the legislature, in providing for these studies, to promote future savings in the construction,

reconstruction, repair and betterment of public highways, county roads, bridges, and city streets. . . . . $250,000

Pursuant to this appropriation, the appellant entered into an agreement with the municipality of Metropolitan Seattle, whereby, for an agreed consideration of $250,000, that body would conduct the planning, engineering, financing and feasibility studies incident to the preparation of a comprehensive public transportation plan for the area of Metropolitan Seattle. These studies have been completed and the results have been published in a report described by the consultant, DeLeuw, Cather & Company, which prepared the report, as follows:

It covers the design elements of the transit system which were not included in previous studies, and it provides a more accurate estimate of cost based on engineering studies . . . .

On motion for summary judgment, the trial court sustained the Attorney General's contention that the appropriation was violative of the eighteenth amendment to the Washington State Constitution (Const. art. 2, § 40) which reads as follows:

All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:

(a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets;

(b) The construction, reconstruction, maintenance, repair, and betterment of public highways, county roads, bridges and city streets; including the cost and expense of (1) acquisition of rights-of-way, (2) installing, maintaining and operating traffic signs and signal lights, (3) policing by the state of public highways, (4) operation of movable span bridges, (5) operation of ferries which are a part of any public highway, county road, or city street;

(c) The payment or refunding of any obligation of the State of Washington, or any political subdivision thereof, for which any of the revenues described in section 1 may have been legally pledged prior to the effective date of this act;

(d) Refunds authorized by law for taxes paid on motor vehicle fuels;

(e) The cost of collection of any revenues described in this section:

*Provided,* That this section shall not be construed to include revenue from general or special taxes or excises not levied primarily for highway purposes, or apply to vehicle operator's license fees or any excise tax imposed on motor vehicles or the use thereof in lieu of a property tax thereon, or fees for certificates of ownership of motor vehicles.

On appeal, the director of the planning and community affairs agency contends that under a liberal construction of the amendment, the planning of a public transportation system serves a "highway purpose."

■ Certain applicable rules of construction must be borne in mind in approaching this question. The first of these is that the state constitution is not a grant, but a restriction on the lawmaking power; and the power of the legislature to enact all reasonable laws is unrestrained except where, either expressly or by fair inference, it is prohibited by the state or federal constitutions. *Pacific American Realty Trust v. Lonctot,* 62 Wn.2d 91, 381 P.2d 123 (1963).

The construction and interpretation of statutes and of provisions of the constitution is a judicial function. *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 380 P.2d 735 (1963).

Words in the constitution must be given their common and ordinary meaning. *State ex rel. Albright v. Spokane,* 64 Wn.2d 767, 394 P.2d 231 (1964).

If the constitutional language is clear and unambiguous, interpretation by the courts is improper; but if the language is unclear and ambiguous, judicial interpretation is not only proper but is an essential responsibility of the

courts. *State ex rel. Swan v. Jones,* 57 Wn.2d. 718, 289 P.2d 982 (1955).

Where the words of a constitution are unambiguous and in their commonly received sense lead to a reasonable conclusion, it should be read according to the natural and most obvious import of its framers, without resorting to subtle and forced construction for the purpose of limiting or extending its operation. *State ex rel. Torreyson v. Grey,* 21 Nev. 378, 32 Pac. 190 (1893).

It is not for the court to engraft an exception where none is expressed in the constitution, no matter how desirable or expedient such an exception might seem. *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965).

Applying these principles and rules to the question before us, we find that the constitutional provision in question is free of ambiguity. In words of plain and commonly understood meaning, it provides that the revenues derived from motor vehicle licenses and excise taxes on fuel, as well as other state revenue intended to be used for highway purposes, shall be paid into a special fund to be used exclusively for *highway* purposes. Lest that term be too narrowly construed, the people have defined its scope in the succeeding subparagraphs (a) through (e). If there were any doubt that the funds were intended to be used exclusively for ways open to the public for motor vehicular traffic, these clarifying provisions should remove them. Bridges and ferries, which might not ordinarily be considered highways, are expressly included because they are a part of such highways; that is to say, motor vehicular traffic must use them in crossing rivers or bodies of water. Roads and streets are expressly included, thus removing any doubt that they come within the definition of highways. Expenses of administration, of construction, reconstruction, maintenance, repairs and betterment are expressly included. But all of the purposes which are listed pertain to highways, roads and streets, all of which are by nature adapted and dedicated to use by operators of motor vehicles, both public and pri-

vate, and none of them pertain to other modes of transportation, such as railways, waterways, or airways. Nor is there any authorization for the expenditure of these funds for the purchase or maintenance of any type of vehicle for public transportation purposes.

■ Thus the words of this provision are unambiguous, and in their commonly received sense lead to a reasonable conclusion, that the people in framing this provision intended to insure that certain fees and taxes paid by them for the privilege of operating motor vehicles should be used to provide roads, streets and highways on which they could drive those vehicles. Express provision was made for the financing of certain structures and activities which might not be considered strictly within the definition of highway purposes, but which were considered necessary for the effectuation of those purposes. For purposes of constitutional interpretation, the express mention of one thing implies the exclusion of another which might logically have been considered at the same time. *Yelle v. Bishop*, 55 Wn.2d 286, 347 P.2d 1081 (1959).

■ The appellant accepts the definition of highway adopted by this court in *State ex rel. Oregon-Wash. R.R. & Nav. Co. v. Walla Walla Cy.*, 5 Wn.2d 95, 104 P.2d 764 (1940), which was taken from 25 Am. Jur. *Highways* § 2 (1940):

"A highway is a way open to the public at large, for travel or transportation, without distinction, discrimination, or restriction, except such as is incident to regulations calculated to secure to the general public the largest practical benefit therefrom and enjoyment thereof. Its prime essentials are the right of common enjoyment on the one hand and the duty of public maintenance on the other. It is the right of travel by all the world, and not the exercise of the right, which constitutes a way a public highway, and the actual amount of travel upon it is not material. If it is open to all who desire to use it, it is a public highway although it may accommodate only a limited portion of the public or even a single family or although it accommodates some individuals more than others."

What is a public transportation system? It is not a "way" at all, but is a number of buses, trains, or other carriers each holding a number of passengers, which may travel upon the highways or may travel upon rails or water, or through the air, and which are owned and operated, either publicly or privately, for the transportation of the public. The mere fact that these vehicles may travel over the highways, or that, as the appellant points out, may relieve the highways of vehicular traffic, does not make their construction, ownership, operation, or planning a highway purpose, within the meaning of the constitutional provision.

If the fact that vehicles affording public transportation make use of highways and the fact that persons who use these vehicles may be refraining from driving their own vehicles and thereby saving wear and tear and congestion on the highways were sufficient to bring the ownership and operation of such vehicles within the definition of "highway purpose," then private bus companies would be justified in claiming subsidies out of the highway funds. This we believe the appellant would be quick to concede was not the intent of the framers of the amendment. We are convinced that it was no more the intent of the framers to provide subsidies for the planning, constructing, owning or operating of public transportation systems, however beneficial such a use of the funds might be to the state and its citizens.

The appellant cites the case of *Automobile Club of Wash. v. Seattle,* 55 Wn.2d 161, 346 P.2d 695 (1959), for the proposition that the motor vehicle fund may be drawn upon for purposes which indirectly aid the highway system. In that case a declaratory judgment was sought to the effect that the payment of damages in a tort action arising out of the negligent operation of a draw bridge was an unconstitutional diversion of state gasoline excise tax funds, and we sustained the contention of the plaintiff. We said in that case that it was not the intent of the people, in adopting the Eighteenth Amendment, to *curtail* or *impede* the road program of this state.

On the contrary, we think it was the intention of the people to limit expenditures from the motor vehicle fund to those things which would directly or indirectly benefit the highway system. Clearly, the payment of a tort judgment does not fall within this category. Such an expenditure could in no way contribute toward the safety, administration, or operation of our highway system, but, rather, would establish a precedent that could result in substantially decreasing those funds reserved for such purposes. This, we feel, would be a detriment rather than a benefit to our highway system. *Automobile Club of Wash. v. Seattle, supra,* at 168-69.

As the respondent points out, the cited case is more supportive of the trial court's action than of the appellant's contention. It is true that we said that funds can be used for purposes which indirectly benefit the highway system, but the same paragraph makes it clear that those purposes are the ones mentioned in the amendment itself, all of which contribute toward the safety, administration, or operation of the highway system.

It may be conceded that, as the appellant argues, taking traffic off the highway benefits the highway in one sense, but it is doubtful that that is the sense in which the framers were interested in obtaining benefits for the highway. It is obvious that it was the desire to secure the building and maintenance of highways so that they could be used; and we can take judicial notice of the fact that automobile drivers generally want more and better highways, leading to more places, rather than fewer, however nearsighted such an attitude may be. Also, it should be observed that the appellant's argument is in more than one way self defeating. If taking drivers of private vehicles off the roads relieves congestion and reduces wear and tear, carrying these same persons in buses may add to the congestion and increase the wear and tear, perhaps not so much as it alleviates these problems, but it is certainly not a benefit to the highways.

■ Also, taking money from the motor vehicle fund and spending it on public transportation does not benefit the highway system, however much it may benefit the

people as a whole or alleviate transportation problems. It may be that the people of this state no longer desire to have the taxes which they pay on motor fuel and licensing spent exclusively on highways and would prefer that some or all of it be spent on public transportation or other purposes. If so, the means of expressing this intent is provided in the constitution and is not so cumbersome that it cannot be utilized with reasonable facility. But courts should never allow a change in public sentiment to influence them in giving a construction to a written constitution not warranted by the intention of the founders. *State ex rel. Clithero v. Showalter,* 159 Wash. 519, 293 Pac. 1000 (1930), *appeal dismissed* 284 U.S. 573, 76 L. Ed. 498, 52 Sup. Ct. 15 (1931).

The appellant urges that, because the legislature has declared that the appropriation is to be used for the purposes of benefiting the highways of the state, this court should assume that there is a factual basis for this declaration. This assumption alone does not render the act constitutional. We have noted the incidental benefits which will accrue to the highway system if Metropolitan Seattle establishes a comprehensive system of public transportation, but the appellant does not suggest that there were any other benefits which the legislature had in mind when it voted the appropriation. These benefits, we have held, do not change the purpose of the expenditure from that of a public transportation purpose to that of a highway purpose.

The respondent calls our attention to the fact that metropolitan municipal corporations are authorized to provide metropolitan public transportation but are not authorized to engage in construction, maintenance or planning of streets and highways, under RCW 35.58. Not only is this true, but the appropriation act makes it clear that the appropriation is to be used for the planning of a public transportation system. The statement that such a system will benefit highways does not change that purpose.

■ A statute is constitutional or unconstitutional in accordance with the way in which it operates and the effect

that it has. 16 Am. Jur. 2d *Constitutional Law* § 150 (1964). The constitutionality of an act depends on its real character and on the end designed to be accomplished rather than on its title or the professions as to its purpose which may be contained in it, and therefore such declarations do not conclude the court. *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 79 L. Ed. 1054, 55 Sup. Ct. 525 (1934), *rehearing denied* 295 U.S. 768, 79 L. Ed. 1709, 55 Sup. Ct. 652 (1935); 16 Am. Jur. 2d *Constitutional Law* § 150 (1964), at 356. Mere declaration cannot give character to a law or turn illegal operation into legal. *Bunting v. Oregon,* 243 U.S. 426, 61 L. Ed. 830, 37 Sup. Ct. 435 (1916).

In *Aberdeen Sav. & Loan Ass'n v. Chase,* 157 Wash. 351, 364, 289 Pac. 536, 290 Pac. 697, 71 A.L.R. 232 (1930), this court said:

Such a legislative declaration is to be carefully considered by the courts and due weight given thereto. Courts should, however, in construing an act containing such a declaration, consider the true operation and effect of the law which must be dealt with on the basis of the practical results which follow its operation, and not alone by legislative declarations contained therein.

Later cases so holding are *Jensen v. Henneford,* 185 Wash. 209, 53 P.2d 607 (1936), and *Clark v. Seiber,* 48 Wn.2d 783, 296 P.2d 680 (1956). As we said in both of these cases, the legislative body cannot change the real nature and purpose of an act by giving it a different title or by declaring its nature and purpose to be otherwise, any more than a man can transform his character by changing his attire or assuming a different name.

As the trial court in its memorandum opinion observed, the constitution lists the purposes for which the motor vehicle fund can be used, and diverting traffic from the highways is not one of them. It would be difficult to ignore the merit in the appellant's position that this is an objective worthy of the most earnest support, but until the constitution is amended by the people, it must be financed through other means.

The judgment is affirmed.

HILL, WEAVER, HAMILTON, and McGOVERN, JJ., and POY-HONEN, J. Pro Tem., concur.

FINLEY, J. (dissenting)—This court is not confronted with an unfamiliar problem in construing the provisions of article 2, section 40 of the Washington State Constitution. The section as drafted begins with a list of certain taxes which are to be paid into a fund to be devoted exclusively to highway purposes. An enumeration of purposes which are to be construed to be highway purposes is then set out. A concluding provision, not here material, excludes certain taxes from the operation of the section.

The juristic problem in the instant appeal is simply whether the section should be accorded a literal or a liberal interpretation by this court. The previous decisions of this court are most convincing to me in settling the law of this state that the purposes listed in section 40 are not exclusive, but that they are, in effect, simply exemplary, and that the section is to be liberally construed. *State ex rel. Toll Bridge Authority v. Yelle,* 61 Wn.2d 28, 41-42, 377 P.2d 466, 474-75 (1962), *reaffirming State ex rel. Bugge v. Martin,* 38 Wn.2d 834, 232 P.2d 833 (1951). To guide the court in liberal construction of the section, a standard of *benefit to the highway* has been adopted by this court, and declared as representative of the intent of the framers concerning the legal effect to be accorded section 40. *Automobile Club of Wash. v. Seattle,* 55 Wn.2d 161, 346 P.2d 695 (1959). Under this standard a majority of the court, in two cases heretofore decided, has rejected disbursements to satisfy a tort judgment, *Automobile Club of Wash.,* and for the relocation costs of public utilities removed from the highway right of way. *State Highway Comm'n v. Pacific Northwest Bell Tel. Co.,* 59 Wn.2d 216, 367 P.2d 605 (1961). The majority opinion in the instant case postulates that the benefit test is to be applied only to expenditures for the safety, administration, or operation of the highway system. It should be pointed out that the majority, having so postulated, assumes that the appellants could not prove such benefits. This is done (1) *in favor of a movant for summary judgment* and (2) *in the*

*face of a rejected offer of proof to the contrary.* In thus deciding, as a matter of law, that the facts of the issue have nothing to do with the result of this case, the majority reject the judgment of both the federal and the state legislatures. *See* 23 U.S.C. § 134 (1964) *and* Laws of 1967, Ex. Ses., ch. 143, § 1, pp. 2259-60.

The court has, in my judgment, previously required that the benefit to the highway system be something more than the payment of social costs attributable to highways. *Automobile Club of Wash. v. Seattle, supra; State Highway Comm'n v. Pacific Northwest Bell Tel. Co., supra.* In any event, the benefit test has not been otherwise restricted by this court. Such a course of interpretation is in full accord with recognized standards of constitutional interpretation.

In the instant case, the majority has rejected *sub silentio* the previous uniform statements of this court as to the benefit test. As will be pointed out below, it is *utterly impossible* to find as a matter of law *on this record* that *no benefit* to the highway can be attributed to the appropriation in question. Instead, the majority has adopted the very rule of strict construction which this court has previously rejected categorically in relation to article 2, section 40. Whether the majority's limitation of the phrase "highway purposes" is described by expressio unius . . . , ejusdem generis or noscitur a sociis it reaches the same result: the limitation of the meaning of "highway purposes" to those purposes conceived by the majority to be enumerated in article 2, section 40.[1]

---

[1]The majority opinion concludes its discussion of the effect of the enumeration by citation to *Yelle v. Bishop,* 55 Wn.2d 286, 347 P.2d 1081 (1959). It should first be noted that the maxim expressio unius . . . appears in that opinion as an alternative ground only, accompanied by overwhelming argument in favor of the court's holding, and used for the purpose of sustaining the legislative action.

Expressio unius . . . is of use solely to determine legislative intent. *DeGrief v. Seattle,* 50 Wn.2d 1, 297 P.2d 940 (1956).

As this court has already determined the legislative intent in adopting article 2, section 40 in the cases discussed in the opening paragraphs of this dissent, and has consistently applied the test there developed of benefit to the highway, I find the majority's analysis confusing. If the benefit test is still part of the law of this state, summary judgment

This court has hitherto avoided falling into such a trap in construing article 2, section 40. *State ex rel. Bugge v. Martin, supra,* which approved the refunding of the Agate Pass Toll Bridge and its inclusion in the state highway system as a free facility through a liberal construction of article 2, section 40 and *State ex rel. Toll Bridge Authority v. Yelle, supra,* approving the use of highway funds to create a guaranty account for the purpose of protecting the bonds of the ferry system and the Hood Canal Bridge against default, simply are not reconcilable with the majority opinion. To be sure, operation of ferries and bridges is mentioned in article 2, section 40, subparagraph (b). *But their financing is not.* The majority, in leaving uncited the *Bugge* and *Toll Bridge Authority* cases, leaves me in some doubt as to the continued validity of those decisions.

I think it desirable that the rejection of an interpretation which has been accepted and followed by this court should be brought about, supported, and justified by something more impressive and convincing than a compendium of the canons of construction, an attempt to define the difference between a highway and a public transportation system, and an attack on the good faith of the legislature. At the level of abstraction at which it is written, the majority opinion begs the question in its finding of no ambiguity and resulting application of expressio unius . . . and the plain meaning test. *See* J. Sutherland, Statutory Construction §§ 4502, 4917 (3d ed. 1943). I am not mesmerized by the mirage of logic synthesized by the majority in disguising a policy decision as an exercise in definition, the result of which is determined by rules the application of which is as elusive as the will o' the wisp. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed,* 3 Vand. L. Rev. 395 (1950). As appellate jurists, we ought not to forget we are construing a state constitution.

---

against the appellant in this case is inappropriate. See pp. 570-573, *infra.* If the benefit test has been abandoned, and the majority's search for a new legislative intent is explicable only on that hypothesis, the majority is less than candid.

*Some* light is thrown on the problems of construction and interpretation of article 2, section 40 by definitions of the term "highway." In that regard, a highway, in essence, certainly involves the right of public user accompanied by the duty of public maintenance. Although the horse and buggy era is part of the past, and even the surrey with the fringe on top is outmoded, other forms of public transport and highway use are conceivable. Neither the common nor the legal understanding of the term "highway" is restricted to land transport in self-propelled vehicles. *State ex rel. Oregon-Wash. R.R. & Nav. Co. v. Walla Walla Cy.,* 5 Wn.2d 95, 104 P.2d 764 (1940); Webster's New International Dictionary 1178 (2d unabr. ed. 1953); Black's Law Dictionary 862 (Rev. 4th ed. 1968).

Since neither the common nor the legal understanding of "highway purposes" is restricted to the physical construction and maintenance of roadways for vehicles driven by petroleum-fueled internal-combustion engines as they were operated and administered in 1944, and since I think that the benefit test ought not to be ignored or abandoned *sub silentio,* I find the majority opinion to be an unsatisfactory rationalization of an *ad hoc* finding of unconstitutionality.

There are sound reasons of policy for finding that the appropriation here in question is permitted by the court's established liberal construction of article 2, section 40, and that it satisfies the test of benefit to the highway, bearing in mind the heavy burden which one who challenges the constitutionality of legislative action must overcome.

It is true that certain policy considerations have existed favoring a careful interpretation of the term "highway purposes." The federal aid program to highways has for many years contained a "diversion" section, 23 U.S.C. § 126 (1964), directed at the application of state gasoline and other user taxes. Use of such revenues for non-highway purposes, as federally defined, can result in a substantial abatement of the aid otherwise apportioned to the state. 23 U.S.C. § 126 (1964); 23 C.F.R. § 1.28 (1968). The rele-

vant language of section 126 is: "for the construction, improvement, and maintenance of highways and administrative expenses in connection therewith, . . . and for no other purposes, under such regulations as the Secretary of Commerce shall promulgate from time to time." The federal definition of "highway" includes roads, streets, parkways, and rights-of-way, bridges, tunnels, drainage structures, signs, guardrails, protective structures, and railroad-highway crossings in connection with highways. 23 U.S.C. § 101 (1964).

Specific further authorizations provide for expenditures for relocation of utility facilities, 23 U.S.C. § 123 (1964), certain toll roads, bridges, tunnels, and ferry facilities, 23 U.S.C. § 129 (1964), elimination of railway crossings hazards, 23 U.S.C. § 130 (1964), billboard and junkyard control by purchase, condemnation, or landscaping, 23 U.S.C. §§ 131, 136 (1964) *as amended* (Supp. III, 1968), and establishment of rest areas, 23 U.S.C. § 319 (1964) *as amended* (Supp. III, 1968). Appropriations for all of the above may be drawn from the federal Highway Trust Fund, although a limitation is placed upon the amounts drawable under sections 131, 136, and 319, *supra.*

In sum, recent federal interpretation of the term "highway purposes" is considerably more in keeping with the realities of 1969 than the interpretation proposed by the majority as a matter of state constitutional law. As to the instant matter, federal cooperation with the states in the development of long-range highway planning *coordinated with other forms of transportation* is not only ordered; but *federal approval* of programs for projects in areas with a population exceeding fifty thousand *is forbidden, if such planning is not taking place.* 23 U.S.C. § 134 (1964). It would appear that conduct of such planning is, for federal purposes, properly allocable to the costs of highway administration.

Much of the change in federal policy in the highway area has occurred in the last 10 years. What further changes are in store we do not know. In the unlikely event that a liberal

construction of article 2, section 40 allows appropriations which are in conflict with the conditions of federal grants-in-aid hereinafter instituted, the legislature can be relied upon to pursue the interest of the state in its appropriations. But, in the event that a strict construction of article 2, section 40 should prevent this state from sharing in federal aid to transportation, the only remedy is the time-consuming and clumsy route of constitutional amendment. Our national transportation policy is changing. This court should seriously weigh the consequences of a standard of interpretation which will require amending the state constitution to conform to each change of the federal standard.

This nation is presently the victim of an urban transportation crisis. It has become clear that unless this crisis is resolved, the city as we know it will cease to function effectively as a focus of business and cultural activity.[2]

This may be graphically illustrated by reference to the subject matter of this lawsuit, a portion of the *Report on a Comprehensive Public Transportation Plan for the Seattle Metropolitan Area* (hereinafter *Report*).[3] The *Report* is part of the record in this case and, having been considered in the motion for summary judgment, the truth of its statements may be deemed conceded.

I begin by taking note of the topography of Seattle, a city noted for the beauty and steepness of its hills. The city is bisected by the Ship Canal; the metropolitan area is bisected by Lake Washington. The former is crossed by six bridges; the latter, by two. Present traffic conditions on these bridges at peak hours range from difficult, at best, to impossible if bad weather or accident disrupts the normal

---

[2] *See e.g.*, Seattle Post-Intelligencer, Dec. 27, 1968 at 6, col. 1:

President-elect Nixon's choice for secretary of transportation, John A. Volpe, said yesterday "highways alone won't do the job" in moving people around the nation's congested urban areas.

. . . .

And he said the large number of vehicles pouring into downtown areas makes it impossible "even to provide parking spaces without having to tear down half the city . . . ."

[3] DeLeuw, Cather & Co., *Report on a Comprehensive Public Transportation Plan for the Seattle Metropolitan Area* (October 1967).

flow of vehicles. The existing freeway moves its peak loads with difficulty and, all too often, with sudden death and injury. All this is common knowledge to any citizen with a radio set; as judges we ought not to ignore this.

The *Report* predicts that by 1990 the population of the four counties of the Puget Sound Governmental Conference will virtually double over 1965. The greater proportion of this growth will be concentrated in King and Snohomish Counties. The *Report* further predicts a net parking deficit of 17,000 parking spaces in the Seattle central business district by 1990. Whether we assume that the vehicles seeking those nonexistent parking spaces are blocking downtown streets, are backed up onto the freeways, or never left their suburban lots, they represent substantial inconvenience and waste.

The effect of such inconvenience is only partially quantifiable. However, using only quantifiable benefits, the *Report* attempted to evaluate the effect of the proposed rapid transit system on the impending traffic jam. It predicted that the system would break even on a cost/benefit analysis by 1979 and that by 1990 the ratio of benefits to costs would be 3.9 to 1. Comparing the benefit attributable to motorists who continued to use the road, estimated at $29,200,000 per annum, with the cost of debt service, estimated at $18,600,000 per annum in 1990, the *Report* found that the *benefit to motorists remaining on the road,* ignoring safety and insurance savings, will exceed the cost to state and local sources of the proposed system.

In sum, the *Report* indicates that the social cost of *not* putting a rapid transit system into operation in the Seattle metropolitan area, exclusive of other significant but non-quantifiable costs allocable to air pollution, decreased highway safety, destruction of scenic values, and harm to race relations occasioned by wholesale freeway condemnations, would be $491,300,000 from now until 1990, and $73,900,000 per annum thereafter.

In the face of such facts, I cannot accept the majority's holding that a rapid transit system—open to all who seek to travel upon it, subject to reasonable regulation, and

maintained by a public agency—does not possess the essential characteristics of a highway. Nor do I see how the exaction of a fare calculated to meet the operating expenses of the system would change its character. Such a fare would be the economic equivalent of the expenditures made in the private sector in the course of using the roads in individual vehicles.

I recognize that a conclusion that rapid transit can fall within highway purposes could be claimed to allow subsidization of one form of transport by another. But it is clear from the admitted facts in this case that the benefit to the taxed form of transport exceeds the cost of the subsidy. On such facts, the transit system itself would meet the benefit test of our previous decisions.

I have dealt with the majority's discussion of whether rapid transit may be of benefit to the highway system or fall within the definition of highway purposes at some length. This discussion appears to me a clear attempt to pose and prejudge a case not now before the court. The instant case concerns not rapid transit itself, but a report studying the effect of a rapid transit system on transportation problems in the Seattle area. The *Report* attempted to reduce the abstraction, rapid transit, to a set of concrete routes and drawings of facilities and equipment. It then attempted to discover who would use such a system, and how often they would use it. The *Report* also attempted to compare, insofar as was possible, the money cost of the system to the predictable benefits and to state, insofar as they were foreseeable, the nonquantifiable social costs and benefits of the system.

It is unquestionable that such a study required the resolution of factual questions involving technical knowledge and refined computations of costs, traffic flow patterns, and the effects of user preferences. It is inconceivable that the factual results of such a study—setting forth the nature and quantum of benefit accruing to the road net from a complementary rapid transit system—would not be of use to the state in future highway planning for the metropolitan area.

The legislative judgment that such factual knowledge would be of use in evaluating necessary changes in the road net in the Seattle metropolitan area, and in assessing the continuing adequacy of that net as proposed, is entitled to respect. *Miller v. Tacoma,* 61 Wn.2d 374, 378 P.2d 464 (1963).[4, 5]

I would respect that legislative judgment. I do not think that this court need impute to the legislature à Machiavellian intent in making this appropriation. If anything, the appropriation for the study reveals both above-average foresight and unusually sound judgment.

The accuracy of that foresight, and the soundness of that legislative judgment, may be gauged with the advantages of hindsight. In August of 1968 the Puget Sound Governmental Conference and the Department of Highways issued a *Transportation Planning Analysis* of the Interstate 90 corridor between Interstate 5 and South Bellevue—a route

[4]The cases relied upon by the majority are not, to me, instructive. The citation to *Bunting v. Oregon,* 243 U.S. 426, 61 L. Ed. 830, 37 Sup. Ct. 435 (1916), is to dictum looking to a result not reached by the court. *Stewart Dry Goods Co. v. Lewis,* 294 U.S. 550, 79 L. Ed. 1054, 55 Sup. Ct. 525 (1935) (Cardozo, Brandeis, and Stone, JJ. in dissent), appears to me the worst possible source from which to seek guidance in standards of judicial review. The case concerned the incidence of a state tax— a matter in which the court has never allowed the legislative recital to be controlling.

As to the Washington cases cited, *Aberdeen Sav. & Loan Ass'n v. Chase,* 157 Wash. 351, 289 Pac. 536, 71 A.L.R. 232 (1930), and *Jensen v. Henneford,* 185 Wash. 209, 53 P.2d 607 (1936), are similarly concerned with the incidence of a tax.

*Clark v. Seiber,* 48 Wn.2d 783, 296 P.2d 680 (1956), insofar as is relevant, was concerned with a statutory declaration that all functions of a school district are state functions. The effect of that declaration, as viewed by the majority, was to change the allocation of taxing authority by changing the location of effective assessment authority. I do not recede from my dissent in that case. But the majority's holding is not authority for the step taken in the instant case.

[5]The legislature is not alone in its judgment. *See* 23 U.S.C. § 134 (1964) which provides that programs for urban areas with a population in excess of 50,000 are not to be approved unless the highway plan is properly coordinated with plans for the improvement of other affected forms of transportation.

which includes the Third Lake Washington Bridge.[6] The *Analysis* relies heavily upon the allocation of rapid transit and road vehicle travel predicted by the *Report*. On the basis of the conclusions of the *Report*, the *Analysis* reviews a series of proposed revisions to the plans for the Third Lake Washington Bridge and its related roadway.

The *Analysis* states that these revisions were necessitated by the travel figures developed in the *Report*, from which "it appeared that the proposed stage construction program previously suggested for the Third Lake Washington Bridge might no longer be valid." *Analysis*, p. 3. This statement is based on the modal split figures[7] developed in a portion of the *Report* not covered by the appropriation challenged in this case. However, the portion of the *Report* concerned with a market survey of rapid transit use indicates that the modal split figures may have erred by under-predicting such use.[8] Such a survey, to be meaningful, must be predicated on a well-defined route plan. Both the route plan and the market survey—as well as second-order, transit-generated effects on the environment—were studied under the appropriation.

It is difficult to determine from the *Report* itself to what extent specific data is attributable to the appropriation challenged. However, it is patently obvious from the *Report*

[6]Puget Sound Governmental Conference and State Department of Highways, *Transportation Planning Analysis: Interstate 90-Corridor Interstate No. 5 to South Bellevue, King County* (August 1968) (Washington State Library, Olympia). Propriety of our judicially noticing the fact that the agencies of state government charged with planning responsibility in this area have substantially changed their position as a result of the *Report*, and indicated that fact in a public document, is clearly established by *Rogstad v. Rogstad,* 74 Wn.2d 736, 446 P.2d 340 (1968), and *State ex rel. Humiston v. Meyers,* 61 Wn.2d 772, 380 P.2d 735 (1963). *See also State ex rel. Humiston v. Meyers, supra* at 785, 380 P.2d at 743 (Finley, J., dissenting).

[7]"Modal split is the technical term applied to methods of estimating the number of travelers using different modes of public and private transportation." *Report,* p. 79.

[8]*Report,* p. 73. Such an under-prediction would compound the difficulties experienced when converting the bus transit lanes to rail rapid transit, as had been contemplated in the proposed stage construction program.

that material questions of fact are present in this case with respect to the relationship between data derived from the appropriation and benefits accruing to the highway system both in general and with regard to the revision of plans for Interstate 90 between Bellevue and the center of Seattle.

The trial court, in the course of its summary judgment, refused to consider an offer of proof comprehended under twelve enumerated areas in which the respondent proposed to show benefit to the highway system. The summary judgment was granted on the assumption that the proof offered was irrelevant, even if true. The enumerated areas included benefits relative to safety, cost of construction, maintenance, and repair and relative to increased efficiency in utilization of existing and future freeways, arterials, county roads, bridges, and streets.

The matters rejected by the trial court were clearly material in determining the issue of benefit to the highway. I am of the opinion that there is a sufficient showing made in the *Report* to indicate benefit to the the highway, keeping in mind the standard which those challenging this appropriation must overcome. Even if this is not so, entry of summary judgment in this case was clearly inappropriate. *Preston v. Duncan,* 55 Wn.2d 678, 349 P.2d 605 (1960).

If the suspicions of the majority are to become the law of this state, I would prefer that those suspicions be supported upon a full factual canvass of the difficult issues involved, rather than upon argument in a vacuum.

I have indicated above that, in my opinion, the necessary showing of benefit to the highway has been made. I would therefore reverse the trial court and enter judgment in favor of the constitutionality of this appropriation.

HUNTER, C. J., and HALE, J., concur with FINLEY, J.

July 10, 1969. Petition for rehearing denied.