256 P.3d 264 (2011)
171 Wash.2d 316
Kemper FREEMAN, Jim Horn, Steve Stivala, Ken Collins, Michael Dunmire, Sarah Rinlaub, Al DeAtley, Jim Coles, Brian Boehm, and Eastside Transportation Association, a Washington nonprofit corporation, Petitioners,
v.
Christine O. GREGOIRE, a state officer in her capacity as Governor of the State of Washington, and Paula J. Hammond, a state officer in her capacity as Secretary of the Washington State Department of Transportation, Respondents,
Central Puget Sound Regional Transit Authority, Intervenor.
No. 83349-4.
Supreme Court of Washington, En Banc.
Argued September 16, 2010.
Decided April 21, 2011.
*266 Philip Albert Talmadge, Thomas M. Fitzpatrick, Talmadge/Fitzpatrick, Tukwila, WA, George E. Kargianis, Law Offices of George Kargianis, Kristen Leigh Fisher, Attorney at Law, Seattle, WA, for Petitioners.
Robert M. McKenna, Maureen A. Hart, Bryce E. Brown Jr., Office of the Attorney General, Olympia, WA, for Respondents.
Desmond Leoron Brown, Sound Transit Union Station, Paul J. Lawrence, Matthew J. Segal, Jessica Anne Skelton, Pacifica Law Group, LLP, Seattle, WA, amicus counsel for Respondent Intervenor-Sound Transit.
Catherine C. Clark, Melody Staubitz, Law Office, of Catherine C. Clark, Seattle, WA, amicus counsel for Nelson Trucking Company.
Lisabeth R. Belden, Law Office of Lisabeth, R. Belden, Seattle, WA, amicus counsel for Save Mi Sov.
C. JOHNSON, J.
¶ 1 This is an original action brought by individual taxpayers Kemper Freeman, Jim Horn, Steve Stivala, Ken Collins, Michael Dunmire, Sarah Rinlaub, Al DeAtley, Jim Coles, Brian Boehm, and Eastside Transportation Association against Governor Christine Gregoire and Secretary Paula Hammond of the Washington State Department of Transportation (DOT).[1] Petitioners seek to invoke the original jurisdiction of this court under article IV, section 4 of the state constitution and RAP 16.2 for issuance of a writ of mandamus barring the governor or secretary from "taking any action" pertaining to the conversion of lanes of Interstate 90 (I-90) for purposes of light rail. We deny the petition.

FACTS
¶ 2 I-90 is a state highway route that, in the vicinity of Lake Washington, extends from the city of Bellevue across Mercer Island towards Interstate 5(I-5) while traversing two bridges. The portion of I-90 in dispute in this case consists of eight total lanes: three general purpose lanes in each direction and a two-lane reversible center roadway. The center roadway is currently restricted to high occupancy vehicles (HOV). I-90 was built, in part, with motor vehicle fund expenditures.[2] The motor vehicle fund is also used to maintain I-90.
¶ 3 The initial proposal to build the section of I-90 between Bellevue and I-5 was besieged by design and configuration conflicts between state and local jurisdictions. On December 21, 1976, following public hearings, King County, the cities of Seattle, Mercer Island, and Bellevue, the municipality of Metropolitan Seattle, and the Washington State Highway Commission executed a memorandum of agreement (MOA) regarding I-90. The MOA established that two of I-90's lanes be "designed for and permanently committed to transit use." Agreed Statement of Facts (ASF) (Feb. 8, 2010), Ex. A at 4.
¶ 4 On September 20, 1978, the United States Secretary of Transportation issued a "Decision Document" approving federal funding for the proposed I-90 roadway. This decision contained an express condition that "public transportation shall permanently have first priority in the use of the center lanes." ASF, Ex. B at 6.
¶ 5 From 1998 to 2004, Central Puget Sound Regional Transit Authority (Sound Transit) and the DOT conducted a planning and environmental review process regarding transit and HOV operation on I-90 between Seattle and Bellevue. Sound Transit and DOT identified plan "R8A" as the preferred alternative. One design feature of R8A was the reconfiguration and addition of HOV lanes to the I-90 outer lanes. In August 2004, the signatories to the 1976 MOA *267 amended their original agreement. The amended 2004 MOA states:
[T]he ultimate configuration for I-90 . . . should be defined as High Capacity Transit in the center roadway and HOV lanes in the outer roadways. . . . High Capacity Transit for this purpose is defined as a transit system operating in dedicated right-of-way such as light rail, monorail, or a substantially equivalent system.
ASF, Ex. C at 2. Shortly thereafter, the Federal Highway Administration (FHA) selected R8A as the preferred alternative.[3]
¶ 6 On November 4, 2008, Sound Transit submitted the Sound Transit 2 Regional Transit System Plan (ST2) for voter approval. Included in the ST2 plan was a proposal for light rail operations beginning in Seattle, traveling over Mercer Island, and proceeding into Bellevue (the East Link). The East Link portion of ST2 provides funding for placing new HOV lanes on the outer roadway of I-90. Unlike the existing, reversible HOV lanes located in the center of I-90, the new HOV lanes would be dedicated to one direction of travel, one eastbound and one westbound, at all times. The East Link also provides that the two center lanes of I-90 be used by Sound Transit for light rail. The ST2 plan was approved by voters. ASF, Ex. E.
¶ 7 Washington State's 2009-2011 biennial transportation budget provides two funding instructions specific to I-90. Engrossed Substitute S.B. 5352, 61st Leg., Reg. Sess. (Wash.2009) (ESSB 5352), at section 204(3), provides for $300,000 to be appropriated from the motor vehicle account "for an independent analysis of methodologies to value the reversible lanes on Interstate 90 to be used for high capacity transit." ESSB 5352, section 306(17) (codified at Laws of 2009, ch. 470, § 306(17)) states:
The legislature is committed to the timely completion of R8A which supports the construction of sound transit's east link. Following the completion of the independent analysis of the methodologies to value the reversible lanes on Interstate 90 which may be used for high capacity transit as directed in section 204 of this act, the department shall complete the process of negotiations with sound transit.
Pursuant to section 204(3), independent appraisals of the I-90 center lanes were delivered to Sound Transit and DOT. In November 2009, $250,000 was paid for the work performed on the valuations. Following agreement on the valuation, Sound Transit and DOT engaged in negotiations that produced a Term Sheet. The Term Sheet is subject to the delivery of a number of future agreements, but essentially outlines that Sound Transit, in exchange for a 40-year air space lease of the center lanes of I-90, will pay DOT an amount equal to the current cost to construct the center lanes and the fair market rental value for the lanes as determined by the independent valuation funded by section 204(3). The funds DOT receives from Sound Transit, for both construction reimbursement and the value of the lease, will be placed back into the motor vehicle fund.
¶ 8 On December 1, 2009, the FHA confirmed that reimbursement of federal-aid highway funds expended in the construction of the center lanes of I-90 would not be required "should [the center lanes] be used for light rail transit." ASF, Ex. J.

ANALYSIS
¶ 9 This court has original jurisdiction over writs of quo warranto or mandamus, but only appellate and revisory jurisdiction over writs of prohibition. Wash. Const. art. IV, § 4. Nonetheless, we can issue a writ to prohibit a state officer from exercising a mandatory duty. Wash. State Labor Council v. Reed, 149 Wash.2d 48, 55-56, 65 P.3d 1203 (2003). The only relief requested by petitioners in their petition against state officer was a writ of prohibition. Pet. Against State Officer at 1-2. In later briefings, petitioners expanded this remedy to include a writ of mandamus. Accordingly, we treat petitioners' action as one for mandamus.
¶ 10 Mandamus is an extraordinary remedy appropriate only where a state official is under a mandatory ministerial duty to perform an act required by law as part of that official's duties. Cmty. Care Coal. v. *268 Reed, 165 Wash.2d 606, 614, 200 P.3d 701 (2009). The mandate must specify the precise thing to be done or prohibited. Walker v. Munro, 124 Wash.2d 402, 407, 879 P.2d 920 (1994) (citing Clark County Sheriff v. Dep't of Soc. & Health Servs., 95 Wash.2d 445, 450, 626 P.2d 6 (1981)). And the mandate must define the duty with such particularity "`as to leave nothing to the exercise of discretion or judgment.'" SEIU Healthcare 775NW. v. Gregoire, 168 Wash.2d 593, 599, 229 P.3d 774 (2010) (emphasis omitted) (internal quotation marks omitted) (quoting State ex rel. Clark v. City of Seattle, 137 Wash. 455, 461, 242 P. 966 (1926)).
¶ 11 Petitioners present two related arguments. First, petitioners argue that sections 204(3) and 306(17) of the 2009-2011 transportation budget violate Washington Constitution article II, section 40 restrictions on the expenditure of motor vehicle fund moneys. Petitioners assert that these two transportation provisos impose a duty to value and transfer the two center lanes. Since the center lanes were constructed, in part, using motor vehicle fund moneys, petitioners' reason that any transfer of the lanes would essentially be an unlawful diversion of motor vehicle fund moneys. Second, petitioners broadly argue that article II, section 40 prohibits the State from entering into "any agreement" with Sound Transit for use of the two center lanes of I-90 for high capacity light rail.

ISSUES

(1) Whether sections 204(3) and 306(17) of the 2009-2011 transportation budget create mandatory duties compelling the issuance of a writ.
¶ 12 Article II, section 40 restricts the expenditure of motor vehicle fund moneys. Article II, section 40, in pertinent part, states:
All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:
(a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets. . . .
¶ 13 Relying upon article II, section 40, petitioners argue that sections 204(3) and 306(17) of the 2009-2011 transportation budget create mandatory duties to expend motor vehicle fund moneys for an unlawful, nonhighway purposei.e., light rail.
¶ 14 Section 204(3) of the 2009-2011 transportation budget appropriates $300,000 from the "motor vehicle account" to fund "an independent analysis of methodologies to value the reversible lanes on Interstate 90 to be used for high capacity transit pursuant to sound transit proposition 1 approved by voters in November 2008."[4] Laws of 2009, ch. 470.
¶ 15 In turn, section 306(17) states:
The legislature is committed to the timely completion of R8A which supports the construction of sound transit's east link. Following the completion of the independent *269 analysis of the methodologies to value the reversible lanes on Interstate 90 which may be used for high capacity transit as directed in section 204 of this act, the department shall complete the process of negotiations with sound transit. Such agreement shall be completed no later than December 1, 2009.
Petitioners argue that section 204(3) imposes a duty to expend motor vehicle fund moneys for a valuation of the center lanes of I-90. Petitioners note that section 204(3) states that the valuation "shall also account for the 1976 Interstate 90 memorandum [and the] 2004 amendment." Correspondingly, the 2004 amendment referenced by section 204(3) specifies that all parties "[c]ommit to the earliest possible conversion of center roadway to two-way High Capacity Transit." Pet. Against State Officer at 13. Pairing the language of section 204(3) and the 2004 amendment, petitioners reason that the State is under a mandatory duty to enter into a valuation and transfer the center lanes to Sound Transit for light rail use. Petitioners further contend that section 306(17) confirms its argument because section 306(17) requires that DOT "shall complete the process of negotiations with sound transit" following the completion of the valuation. Br. of Pet'r's at 26.
¶ 16 In response, Sound Transit argues that the valuation authorized by section 204(3) does not violate article II, section 40 because the appropriation was to value the lanes to determine how much to repay the motor vehicle fund, not to fund any portion of the plan to construct light rail. Additionally, DOT argues that neither of the sections cited by petitioners creates a mandatory duty to sell or lease portions of I-90 for light rail. DOT asserts that these provisions simply establish a valuation approach for the center lanes of I-90. DOT further reasons that any expenditure for a valuation would be consistent with subsection (a) of article II, section 40 because subsection (a) states that expenditures for the "administration of public highways" serve a constitutionally lawful highway purpose. We agree with DOT. While petitioners argue that sections 204(3) and 306(17) create a mandatory duty to expend motor vehicle fund moneys for an unlawful, nonhighway purpose, this argument is a mischaracterization of what the appropriation essentially does: value property.
¶ 17 Under the relief requested by petitioners, the critical inquiry is whether section 204(3) imposes a specific, nondiscretionary duty for DOT to expend the $300,000. But section 204(3) does not contain any language that can be plausibly construed as creating a duty on DOT to expend the appropriated funds. Section 204(3) is merely an appropriation, the legislature's act of setting aside a sum of money for a particular purpose. Put another way, section 204(3) provides legislative authorization of the necessary funding so that DOT may engage in a valuation. But authorizing money for a valuation of land neither creates a duty to spend the money for the valuation nor creates a duty to transfer the land after the valuation. Indeed, transportation budget provisos authorizing spending do not control the disposition of highway property because our state has an established statutory framework governing such transfers. See RCW 47.12.120 (permitting lease of highway land or air space); see also RCW 47.12.063 (allowing sale of highway land when not needed for transportation purposes); RCW 47.12.080 (allowing transfer and conveyance of DOT land when in public interest); RCW 47.12.283 (authorizing sale of highway land by public auction).
¶ 18 Furthermore, the language in section 204(3) stating that the valuation "shall account for" the 1976 MOA and 2004 amendment does nothing to establish a mandatory duty to transfer the center lanes. The 1976 MOA and 2004 amendment merely set out principles regarding the future development of the I-90 corridor. See ASF, Exs. A, C. These agreements simply provide guidance for decisions regarding the future development of I-90. Petitioners do not establish how, or why, these agreements create a nondiscretionary course of action that the state must follow. But to compel an action in mandamus, a duty needs to be mandatory *270 and ministerial: the duty must be defined with such particularity as to leave nothing to the exercise of discretion or judgment. SEIU, 168 Wash.2d at 599, 229 P.3d 774.
¶ 19 Even when the language of section 204(3) is coupled with the language in section 306(17) stating that DOT "shall complete the process of negotiations with sound transit," no mandatory duty appears. Although the word "shall" generally connotes a mandatory directive, we must bear in mind what action section 306(17) requires DOT shall do, and that is to "complete the process of negotiations." Laws of 2009, ch. 470. Section 306(17) does not provide any parameters for the negotiations. Furthermore, section 306(17)'s directive to negotiate does not indicate what the final result of the negotiations shall be or what form of transfer the negotiations will result in. In other words, section 306(17) does nothing more than affirm DOT's commitment to enter into negotiations ultimately culminating in future discretionary decisions. To issue a writ, this court requires that the duty be explicitly defined so that no discretion or judgment remains for the official commanded under the duty. See SEIU, 168 Wash.2d at 599, 229 P.3d 774. In reviewing the budget provisos, the only arguable directive found in sections 204(3) and 306(17) is an authorization to expend $300,000 for a valuation. But this authorization does not create a mandatory duty to spend the appropriated funds. Furthermore, the directive provided by section 306(17) is open-ended and lacks the specificity necessary for this court to issue a writ.
¶ 20 However, this does not end our inquiry because petitioners also argue that the valuationstanding aloneis an unconstitutional use of motor vehicle funds under article II, section 40. Petitioners primarily rely on State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 452 P.2d 943 (1969).
¶ 21 In response, DOT argues that the expenditure at issue in this case is incongruent with the expenditure in O'Connell because the current expenditure is for the benefit of the state highway system. DOT asserts that the expenditure is to ensure that the center lanes of I-90 are leased for fair market value. In essence, DOT argues that the valuation is necessary to provide adequate reimbursement to the motor vehicle fund. Although article II, section 40 restricts expenditures of the motor vehicle fund to those expenditures serving a "highway purpose," DOT contends that the valuation is authorized under subsection (a) of article II, section 40, which expands the definition of "highway purposes" to include "[t]he necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets." DOT also argues the appropriation in this case is similar to an expenditure this court allowed in another case, State ex rel. Washington State Highway Commission v. O'Brien, 83 Wash.2d 878, 523 P.2d 190 (1974).
¶ 22 In O'Connell, a senate appropriation bill earmarked $250,000 from the state motor vehicle fund to be paid to municipal corporations to fund the planning, engineering, financial and feasibility studies incident to the preparation of a comprehensive transportation plan. This comprehensive plan contemplated the use of buses, trains, and other carriers. The O'Connell court found that financing provided directly to municipal corporations creating transportation plans intended to relieve highways of vehicular traffic did not fall directly under "highway purposes" within the meaning of article II, section 40. O'Connell, 75 Wash.2d at 563, 452 P.2d 943.
¶ 23 Petitioners argue that the expenditure in O'Connell is substantially the same as the expenditure now before this court because the unconstitutional expenditure in O'Connell was for a transportation plan that included light rail. But O'Connell is factually distinct from the present case because of the nature of the expenditure involved. In O'Connell the expenditure was provided to municipalities to conduct studies regarding alternative transportation forms. The expenditure was essentially a governmental grant to an outside enterprise whose goal was in the public interest. This fact was an element of the O'Connell court's analysis of the expenditure: "We are convinced that it was no more the intent of the framers to provide subsidies for the planning, constructing, owning or operating *271 of public transportation systems, however beneficial such a use of the funds might be to the state and its citizens." O'Connell, 75 Wash.2d at 560, 452 P.2d 943 (emphasis added). Unlike the expenditure in O'Connell, the expenditure in this case was provided directly to DOT, not a third party. Therefore, O'Connell provides limited guidance regarding the expenditure presently before this court.
¶ 24 In determining the constitutionality of expenditures under article II, section 40, this court looks to the connection between the expenditure and the contemplated highway use.[5] Here the appropriation was for a valuation of the center lanes of I-90 in order for DOT to begin the process of negotiating a transfer of the center lanes to Sound Transit. Since DOT is statutorily authorized to transfer highway lands,[6] appropriations authorizing a valuation related to such transactions necessarily serve a highway purpose. Unlike the expenditure in O'Connell, which was given to third party municipal corporations and directed specifically at financing the planning of a comprehensive mass transit scheme, the appropriation in this case was provided directly to DOT and was a necessary preliminary step in managing the use of highway lands.
¶ 25 Our holding in O'Brien provides more relevant guidance. In O'Brien, the director of the Washington State Department of Highways refused to issue payment from the motor vehicle fund for preliminary engineering work for two "park and ride" facilities located adjacent to the interchange between I-90 and I-405. The director refused to issue the funds under advice that the expenditure served an unlawful highway purpose under article II, section 40. The O'Brien court phrased the issue as "whether the objective of more efficient utilization of highways and safety in travel through the use of `park and ride' facilities . . . comes within the ambit of [article II, section 40]." O'Brien, 83 Wash.2d at 882, 523 P.2d 190. In granting a writ compelling the director to produce payment from the motor vehicle fund, the O'Brien court stated, "Although the objective of efficient utilization in the operation of highways. . . is not specifically spelled out, it is, nevertheless, implicitly related to the specific highway purposes delineated in [article II, section 40]." The O'Brien court further noted that expenditures "`indirectly benefit[ing]'" the highway system are constitutionally valid, if the expenditures "`contribute toward the safety, administration, or operation of the highway system.'" O'Brien, 83 Wash.2d at 882-83, 523 P.2d 190 (emphasis omitted) (citing State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 561, 452 P.2d 943 (1969)).
¶ 26 O'Brien is instructive here. The expenditure at issue in this case is for the administration of highway lands. The valuation allows DOT to explore the feasibility of transferring or leasing the center lanes of I-90 to accommodate light rail mass transit. And as noted above, DOT has specific statutory authority to transfer highway lands, and the decision of whether to transfer or lease lands is inherently a function of the administration of highway property. Since the expenditure serves an administrative function, the expenditure "indirectly benefits" our public highways and is lawful under article II, section 40. See O'Brien, 83 Wash.2d at 882, 523 P.2d 190. Therefore, we hold that a valuation performed in anticipation of the eventual transfer or lease of highway land *272 indirectly benefits public highways and serves a valid highway purpose under article II, section 40.
¶ 27 Petitioners argue that the valuation must be viewed in light of its underlying purpose to transfer the center lanes of I-90 for light rail use. However, as shown above, petitioners do not establish that sections 204(3) and 306(17) impose a mandatory duty upon the State to transfer the center lanes to Sound Transit. Since this original action asks this court to exercise its mandamus powers to prevent a mandatory, nondiscretionary duty, we shall not broaden our inquiry to view the transaction according to any discretionary decisions that may occur after the valuation. It is sufficient that the only identified mandatory duty, the valuation, is a lawful expenditure for a highway purpose.

(2) Whether a writ is appropriate to prohibit "any agreement" to transfer portions of I-90 for light rail use.
¶ 28 Petitioners argue that article II, section 40 prohibits DOT from entering into "any agreement" with Sound Transit for use of the two center lanes of I-90 for light rail. Petitioners assert that the transfer is essentially already final, as evidenced by the Term Sheet between DOT and Sound Transit. Petitioners argue that article II, section 40 creates a mandatory duty to expend motor vehicle funds only for highway purposes. Since the center lanes were constructed, in part, using motor vehicle fund moneys, petitioners reason that any transfer of the lanes for light rail transit would essentially be an unlawful diversion of motor vehicle fund moneys in violation of article II, section 40.
¶ 29 In response, DOT argues that article II, section 40 does not bar the state from transferring highway property. As an intervening party, Sound Transit similarly argues that article II, section 40 only applies to restrict certain expenditures from the motor vehicle fund. Sound Transit argues that nothing in article II, section 40 prevents the transfer of highway lands if the motor vehicle fund is properly reimbursed.
¶ 30 We need not reach the arguments presented by DOT and Sound Transit. At the onset, petitioners' request for mandamus to ensure that article II, section 40 funds will be used exclusively for highway purposes is too general to command issuance of the writ. Walker, 124 Wash.2d at 408, 879 P.2d 920 ("`Mandamus will not lie to compel a general course of official conduct, as it is impossible for a court to oversee the performance of such duties.'" (quoting State ex rel. Pac. Am. Fisheries v. Darwin, 81 Wash. 1, 12, 142 P. 441 (1914))). And petitioners fail to identify a present constitutional violation remediable by writ. Instead, petitioners seek a writ broadly prohibiting DOT from taking or authorizing any future action with respect to the transfer or occupancy of I-90 for light rail. We have consistently held that we will not issue writs generally ordering state officers to adhere to the constitution because we presume that they already do so without our direction. Walker, 124 Wash.2d at 409, 879 P.2d 920.
¶ 31 Secondly, the remedy of mandamus contemplates the necessity of indicating the precise thing to be done, but petitioners' request fails to identify what the petitioners actually seek to restrain. Because petitioners broadly move this court to prevent the governor or DOT from "taking or authorizing any action" with respect to the transfer of the center lanes of I-90, petitioners are, in essence, asking this court to manage DOT's potential discretionary decisions. However, the jurisdiction granted this court under article IV, section 4 does not authorize this court to assume general control or direction of official acts. Walker, 124 Wash.2d at 407, 879 P.2d 920 (citing State ex rel. Taylor v. Lawler, 2 Wash.2d 488, 490, 98 P.2d 658 (1940)). DOT has statutory authority to discretionarily manage highway property. Furthermore, as explained above, DOT has no immediate duty to transfer the center lanes of I-90 to Sound Transit and no such transfer has yet occurred. Since this court is not empowered to command the discretionary decisions of state officials in advance, we cannot direct or prohibit DOT's future management of highway property. While petitioners point to the Term Sheet as evidence of DOT's commitment to lease the center lanes to Sound Transit, the Term Sheet expressly indicates that the agreement *273 is subject to the execution and delivery of a number of future agreements and instruments. ASF, Ex. K, at Term 9. Although petitioners argue that the eventual transfer of the center lanes will violate article II, section 40, this court will not issue a writ in anticipation of a failure to discharge a duty. The duty must exist at the time the writ is sought. Since petitioners have failed to identify a present duty to transfer the center lanes for light rail use, the petition for a writ is premature. Walker, 124 Wash.2d at 409, 879 P.2d 920.
¶ 32 Taking into account the language of the Term Sheet requiring future actions by DOT and Sound Transit, the petitioners are, essentially, asking this court to grant a declaratory judgment that DOT may not sell or lease any portion of I-90 to Sound Transit for light rail use. But such a request is beyond this court's original jurisdiction. This court's authority in original jurisdiction is derived from the constitution, which does not include original jurisdiction in a declaratory judgment action. Walker, 124 Wash.2d at 411, 879 P.2d 920. Even if we were to consider DOT's proposed lease agreement with Sound Transit, we note that DOT is statutorily authorized to sell, transfer or lease highway lands within certain statutory restrictions. Whether this potential lease specifically complies with these statutory provisions is not before us at this time and, in any event, the statutory provisions authorizing transfers of highway land do not generally violate article II, section 40.
¶ 33 In sum, petitioners ask for a writ prohibiting DOT from entering into any agreement that places light rail on the center lanes of I-90. We will not issue such a writ.

CONCLUSION
¶ 34 Petitioners have not established a mandatory ministerial duty requiring DOT to transfer the center lanes of I-90 to Sound Transit. Furthermore, the appropriation provided by section 204(3) of the 2009-2011 transportation budget authorizing a valuation of the center lanes of I-90 serves a highway purpose under article II, section 40.
¶ 35 The petition for a writ of mandamus is denied.
WE CONCUR: BARBARA A. MADSEN, Chief Justice, TOM CHAMBERS, SUSAN OWENS, DEBRA L. STEPHENS, Justices, and KAREN G. SEINFELD, Justice Pro Tem.
ALEXANDER, J. (concurring).
¶ 36 Although I agree with the dissent's general point that our state constitution forbids the use of motor vehicle funds for nonhighway purposes, I concur with the majority's view that the petitioners' request for a writ of mandamus should be denied. I reach this conclusion for two reasons. The first is that the lion's share of the $300,000 that the legislature appropriated in 2009 for an analysis of methodologies to value the reversible lanes on Interstate 90 has been expended. Indeed, the money was expended prior to the time this court entered an order to review the petition. Even assuming that expending money for the purpose of valuing these traffic lanes runs afoul of the constitution, the undeniable fact is that the action has been taken. Asking us to bar the named officials from expending the funds now is a bit like asking us to put the genie back in the bottle. While there may be other remedies available to the petitioners to restore the funds to the state treasury, the interests of other parties who are not in this action would be affected and, thus, these parties would need to be joined.
¶ 37 Insofar as petitioners seek the writ to prohibit the Department of Transportation and the governor from "taking or authorizing any action with respect to the sale, lease, or occupancy of any portion of Interstate 90 to Sound Transit," I agree with the majority that the relief requested is "too general to command issuance of the writ." Pet. Against State Officer at 16; majority at ___.
I CONCUR: KAREN G. SEINFELD, Justice Pro Tem.
J.M. JOHNSON, J. (dissenting).
¶ 38 The majority fails to uphold an express provision of our state constitution forbidding the use of motor vehicle fund (MVF) *274 moneys for any nonhighway purpose, including public transportation. The sworn duty of this court is not to rewrite or avoid the constitution but rather to enforce it.
¶ 39 When the people of Washington established the State's government, "they wrote their own constitution, a basic law to always guide all public officers in the performance of their functions. And they placed upon the courts the solemn obligation of keeping that constitution inviolate. The constitution was written to be obeyed, not evaded or by-passed." State ex rel. Hamblen v. Yelle, 29 Wash.2d 68, 91, 185 P.2d 723 (1947) (emphasis added) (Schwellenbach, J., dissenting).
¶ 40 The majority opinion also disregards this court's determinative precedent that forbids the use of constitutional motor vehicle funds for public transportation. "The obligation to follow precedent begins with necessity, and a contrary necessity marks its outer limit[;] . . . no judicial system could do society's work if it eyed each issue afresh in every case that raised it." Planned Parenthood v. Casey, 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citing Benjamin Cardozo, THE NATURE OF THE JUDICIAL PROCESS 149 (1921)). For these reasons, I dissent.

1. The Constitution Prohibits the Use of MVF to Fund Public Transportation

¶ 41 The Washington Constitution provides that all fees collected
as license fees for motor vehicles and all excise taxes collected . . . on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes.
WASH. CONST. art. II, § 40 (emphasis added). This same provision then goes on to explain the term "highway purposes," expressly enumerating specific authorized types of expenditures. Id. Though the provision authorizes the use of the MVF to fund the operation of ferries (a part of the Washington highway system), it does not recognize expenditures for bus, train, light rail, or any other type of public transportation. Applying the traditional interpretive canons, the Washington Constitution prohibits the use of money from the MVF to fund public transportationincluding light rail. "Under the statutory canon expressio unius est exclusio alterius, the express inclusion in a statute of situations in which it applies implies that other situations are intentionally omitted." In re Det. of Strand, 167 Wash.2d 180, 190, 217 P.3d 1159 (2009).

2. Direct Precedent Prohibits Using the MVF to Fund Public Transportation

¶ 42 Were any question left after considering the text of the state constitution, this court specifically decided this same issue in State ex rel. O'Connell v. Slavin, 75 Wash.2d 554, 452 P.2d 943 (1969). In O'Connell, we held that public transportation is not a "highway purpose" under article II, section 40. This court stated that the "construction, ownership, operation, or planning" of a public transportation system is not "a highway purpose, within the meaning of [article II, section 40]."). Id. at 560, 452 P.2d 943. Thus, this court held that the state constitution prohibits an appropriation from the MVF to fund public transportation projects. Id. ("We are convinced that it was no more the intent of the framers to provide subsidies for the planning, constructing, owning or operating of public transportation systems, however beneficial such a use of the funds might be to the state and its citizens.").
¶ 43 The majority concedes that "[s]ection 204(3) . . . appropriates $300,000 from the `motor vehicle account' to fund `an independent analysis of methodologies to value the reversible lanes on Interstate 90 to be used for high capacity transit. . . .'" Majority at ___ (quoting Laws of 2009, ch. 470, § 204(3)). In other words, the legislation at issue appropriates MVF moneys to value land for the ultimate purpose of high capacity transita form of public transportation. Both the text of the state constitution and our holding in O'Connell prohibit using the MVF to fund any stage of public transportation projects, including preparation and planning. Strict adherence to traditional canons of interpretation and well-settled precedent *275 leads to the conclusion that the appropriation at issue is unconstitutional.

3. The Majority's Flawed Analysis

¶ 44 The majority pays little attention to the text of the constitution and unconvincingly attempts to distinguish the holding of this court in O'Connell. The majority suggests that O'Connell provides "limited guidance" because that expenditure was for the Department of Transportation (DOT) and not for a "third party." Majority at 271.
¶ 45 The majority's attempt to distinguish O'Connell is unpersuasive. Article II, section 40 prohibits the use of the MVF for all nonhighway purposes regardless of whether the appropriation goes directly to DOT, a municipality, or a private third party. Article II, section 40 prohibits the State simpliciterwhether DOT, the legislature, or any other governmental entityfrom using the MVF for nonhighway purposes. The constitutional analysis under article II, section 40 does not change depending on who receives the appropriation. The constitution does not tolerate money laundering to avoid its mandates.
¶ 46 Besides distinguishing O'Connell, the majority argues that because statutes authorize the transfer of highway lands, a valuation for land transfer is necessarily a highway purpose. Majority at 271. There are several flaws with this argument. First, the surplus land statutes relied on by the majority to support this argument do not authorize transfer of bridge lanes currently needed or used for highway purposes.[1] The residents of this state currently need and use the bridge lanes on Interstate 90 for highway purposes, and thus the statutes relied on by the majority do not authorize their transfer. Ask drivers stuck on this bridge at rush hour whether any lanes are "surplus."
¶ 47 Second, even if statutes authorize DOT to transfer surplus land to Sound Transit, it is inconsequential because the constitution prohibits this transfer. Article II, section 40 is a constitutional provision. If a statute violates the state constitution, this court must declare it a nullity. See Moody v. United States, 112 Wash.2d 690, 693, 773 P.2d 67 (1989).
¶ 48 This court's primary role is to be guardian of the law and final arbiter of the state constitution. See In re Salary of Juvenile Dir., 87 Wash.2d 232, 241, 552 P.2d 163 (1976) ("Both history and uncontradicted authority make clear that `"[i]t is emphatically the province and duty of the judicial department to say what the law is."'" (alteration in original) (quoting United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803)))).
¶ 49 In its final argument, the majority claims support from State ex rel. Washington State Highway Commission v. O'Brien, 83 Wash.2d 878, 523 P.2d 190 (1974). In O'Brien, we granted a writ of mandamus to the state treasurer to compel expenditure of MVF moneys for the construction of park-and-ride facilities in the metropolitan Seattle area. O'Brien, 83 Wash.2d at 883, 523 P.2d 190. In granting the writ, we noted that our decision in O'Connell was consistent. Id. O'Brien dealt with park-and-ride facilities that served motorists who transfer to other vehicles that operate on state highways. Id. In contrast, O'Connell had dealt strictly with public transportation, a prohibited expenditure. Id. As we stated in O'Brien:
[O'Connell] concerned the use of highway funds for the financing of a public transportation system, including busses, trains or other carriers, each holding a number of passengers, which may travel upon highways or rails or water or through the air. We properly held that such a use of funds was not for a highway purpose contemplated by [article II, section 40].
*276 Id. (emphasis added). Indeed, the O'Brien opinion specifically identified railway public transportation as a nonhighway purpose under article II, section 40. Id. Under O'Brien, park-and-ride facilities both relieve congestion and constitute a valid highway purposepublic transportation projects do not. The majority miraculously transforms O'Brien's affirmation of the constitutional prohibition on appropriating money from the MVF for railway public transportation into authority for its directly contrary holding.
¶ 50 O'Connell held that the state constitution prohibited legislation appropriating funds for any nonhighway purposeto include public transportation. O'Connell, 75 Wash.2d at 560, 452 P.2d 943. O'Brien affirmed this conclusion. O'Brien, 83 Wash.2d at 883, 523 P.2d 190. Here, the Engrossed Senate Substitute Bill 5352, 61st Leg., Reg. Sess. (Wash.2009) (ESSB 5352), at section 204(3) appropriates constitutionally dedicated funds to public transportation purposes. Under our precedent, the appropriation is unconstitutional.

4. Sound Transit's Flawed Argument

¶ 51 Like the majority's analysis, Sound Transit's argument is unavailing. Sound Transit argues that the expenditure "authorized by section 204(3) does not violate article II, section 40 because the appropriation was to value the lanes to determine how much to repay the motor vehicle fund, not to fund any portion of the plan to construct light rail." Majority at 269. Constitutional prohibitions on the legislature's power to spend money equally apply to its power to lend money. The fact that Sound Transit claims an intention to reimburse the MVF for the expenditure provides no constitutional justification for the expenditure in the first place.
¶ 52 Consider an analogy from elsewhere in our constitution. Like article II, section 40's prohibition on the expenditure of MVF moneys for nonhighway purposes, article IX, section 2 of the Washington Constitution requires that common school funds "`shall be exclusively applied to the support of the common schools.'" Mitchell v. Consol. Sch. Dist. No. 201, 17 Wash.2d 61, 65, 135 P.2d 79 (1943) (emphasis omitted) (quoting WASH. CONST. art. IX, § 2). Suppose the legislature appropriated common school funds to value school property for later transfer to Sound Transit? Could Sound Transit (or the legislature) render such an appropriation constitutional by a simple agreement to later reimburse the common school fund?
¶ 53 The answer is obviously "no," and I am confident the majority (and the public) would quickly dismiss such flawed reasoning in the context of public education. Unfortunately, the disparate treatment of these two constitutional prohibitions does not stem from the constitutional text. While diverting funds from public education is a serious matter, apparently diverting funds from the constitutional state highway fund is not. This distinction does not arise from the constitution or law but simply arises from value judgmentsan invalid basis on which to decide cases if our state is to be governed by "a government of laws not of men." Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 177, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Douglas, J., concurring).

CONCLUSION
¶ 54 "[B]eneficent aims, however great or well directed, can never serve in lieu of constitutional power." Carter v. Carter Coal Co., 298 U.S. 238, 291, 56 S.Ct. 855, 80 L.Ed. 1160 (1936). Ignoring this fundamental principle of constitutional jurisprudence, the majority disregards its obligation to follow the state constitution because some prefer railway transit to the highway use of a bridge built with state highway funds. "But it should go without saying that the vitality of. . . constitutional principles cannot be allowed to yield simply because of disagreement with them." Brown v. Bd. of Educ., 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). For all of these reasons, I would hold that the appropriation in ESSB 5352, section 204(3), is unconstitutional.
¶ 55 The people adopted a constitutional provision in article II, section 40, prohibiting the use of vehicle fees and excise taxes for anything other than highway purposes. In the wake of this constitutional provision, gas taxes have continued to rise and license fees, though limited by initiative, raise millions of *277 dollars for the state. The people have tolerated or authorized such taxes in the past predicated on the constitutional promise that the revenues collected by the state through such taxes and fees will be used exclusively for highway purposes. Because the legislature has broken that constitutional promise and the majority declines to enforce it, I dissent.
I CONCUR: RICHARD B. SANDERS, Justice Pro Tem.
NOTES
[1] Following the filing of the original action, this court granted a motion to intervene by Central Puget Sound Regional Transit Authority (Sound Transit). Additionally, amicus briefs were filed by Save MI SOV and Nelson Trucking Company.
[2] Although the parties stipulated that I-90 was built in part with motor vehicle fund moneys, the petitioners dispute the exact amount of motor vehicle funds expended.
[3] Although the FHA selected R8A as the preferred alternative, the FHA's record of decision does not provide any mention of light rail, monorail, or any specific system.
[4] Section 204(3) in its entirety states:

$300,000 of the motor vehicle accountstate appropriation is for an independent analysis of methodologies to value the reversible lanes on Interstate 90 to be used for high capacity transit pursuant to sound transit proposition 1 approved by voters in November 2008. The independent analysis shall be conducted by sound transit and the department of transportation, using consultant resources deemed appropriate by the secretary of the department, the chief executive officer of sound transit, and the co-chairs of the joint transportation committee. It shall be conducted in consultation with the federal transit and federal highway administrations and account for applicable federal laws, regulations, and practices. It shall also account for the 1976 Interstate 90 memorandum of agreement and subsequent 2004 amendment and the 1978 federal secretary of transportation's environmental decision on Interstate 90. The department and sound transit must provide periodic reports to the joint transportation committee, the sound transit board of directors, and the governor, and report final recommendations by November 1, 2009.
Laws of 2009, ch. 470.
[5] See State ex rel. Bugge v. Martin, 38 Wash.2d 834, 232 P.2d 833 (1951) (examining whether motor vehicle fund moneys may be used to issue bonds to provide funding for bridge construction); Auto. Club of Wash. v. City of Seattle, 55 Wash.2d 161, 346 P.2d 695 (1959) (examining whether motor vehicle fund moneys may be used to satisfy a tort judgment arising from negligent operation of a movable span bridge); Wash. State Highway Comm'n v. Pac. Nw. Bell Tel. Co., 59 Wash.2d 216, 367 P.2d 605 (1961) (examining whether motor vehicle fund moneys may be used to pay for removal of utility facilities located in highway right-of-way); State ex rel. Wash. State Highway Comm'n v. O'Brien, 83 Wash.2d 878, 523 P.2d 190 (1974) (examining whether motor vehicle fund moneys may be used for the design, acquisition, and construction of park and ride facility).
[6] See RCW 47.12.120 (permitting lease of highway land or air space); see also RCW 47.12.063 (allowing sale of highway land when not needed for transportation purposes); RCW 47.12.080 (allowing transfer and conveyance of DOT land when in public interest); RCW 47.12.283 (authorizing sale of highway land by public auction).
[1] The majority cites to four statutes that it claims authorize DOT to transfer highway land. Majority at ___ n.6. However, these statutes only authorize DOT to transfer land that is no longer needed or used for highway purposes. See RCW 47.12.120 (authorizing rental of lands "not presently needed" for highway purposes); RCW 47.12.063(2) (authorizing sale of property "no longer required for transportation purposes. . ."); RCW 47.12.080 (authorizing transfer of "unused" property); RCW 47.12.283(1) (authorizing sale of property "no longer required for highway purposes . . .").