**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE SEP 1 2 2013

~~Madsen~~ C.J.
CHIEF JUSTICE

This opinion was filed for record
at _4:00 a.m._ on _September 12, 2013_

Ronald R. Carpenter
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| KEMPER FREEMAN; JIM HORN; STEVE STIVALA; KEN COLLINS; MICHAEL DUNMIRE; SARAH RINDLAUB; AL DEATLEY; JIM COLES; BRYAN BOEHM; EMORY BUNDY; ROGER BELL; EASTSIDE TRANSPORTATION ASSOCIATION, a Washington nonprofit corporation; and MARK ANDERSON, <br><br> Appellants/Cross-Respondents, <br><br> v. <br><br> STATE OF WASHINGTON; CHRISTINE O. GREGOIRE, Governor; and PAULA HAMMOND, Secretary, Department of Transportation, <br><br> Respondents, <br><br> CENTRAL PUGET SOUND TRANSPORTATION DISTRICT, <br><br> Respondent-Intervenor/ Cross-Appellant. | No. 87267-8 <br><br> En Banc <br><br><br> Filed  SEP 1 2 2013 |

MADSEN, C.J.—The Washington State Department of Transportation (WSDOT) and the Central Puget Sound Regional Transit Authority (Sound Transit) entered into an agreement that would lease a portion of Interstate 90 (I-90) to Sound Transit for light rail. As consideration, Sound Transit agreed to pay an amount equal to the State's contribution

to construct the center lanes and the value of a 40 year lease. Sound Transit also agreed to advance the cost of replacing the center two lanes, credited toward its lease. The appellants contend this lease violates article II, section 40 of the Washington Constitution and RCW 47.12.120. We hold that the lease does not violate article II, section 40 and RCW 47.12.120, affirm the trial court's summary judgment order in favor of the respondents, and deny the appellants' request for attorney fees.

FACTS AND PROCEDURAL HISTORY

Interstate 90 (I-90) is a state highway. The portion in dispute extends over Lake Washington, connecting Seattle, Mercer Island, and Bellevue. It consists of eight motor vehicle lanes, including three general purpose lanes in each direction and two reversible high occupancy vehicle (HOV) lanes in the center.

In 1976, several parties executed a "Memorandum of Agreement" (MOA) resulting in the present configuration of I-90. These parties included King County, Seattle, Mercer Island, Bellevue, the municipality of Metropolitan Seattle, and the Washington State Highway Commission. The parties to the MOA declared that I-90 would have no more than eight lanes and that two of the lanes would be designed for and permanently committed to transit use. I-90 was to be designed so that "conversion of all or part of the transit roadway to fixed guideway is possible." Clerk's Papers (CP) at 1017. The construction relied in part on federal funding, with the United States secretary of transportation issuing approval in 1978 upon the express condition that "public transportation shall permanently have priority in the use of the center lanes." *Id.* at 1031.

From 1998 to 2004, Sound Transit and WSDOT engaged in planning and review regarding transit and HOV operation over Lake Washington. Several plans were considered, with plan "R-8A" being the preferred alternative. R-8A included restriping and adding two HOV lanes to the outer lanes, new HOV on and off ramps on Mercer Island, and improvements to HOV access at Bellevue Way, while retaining the existing reversible center lanes.

In 2004, the signatories of the 1976 MOA amended the MOA to state that the "ultimate configuration" of I-90 was high capacity transit in the center lanes and HOV lanes in the outer roadways. *Id.* at 1033. High capacity transit was defined to include light rail. The United States Department of Transportation Federal Highway Administration also selected R-8A as the preferred alternative because it would "accommodate the ultimate configuration of I-90 (High Capacity Transit in the center lanes)," among other reasons. *Id.* at 1432.

In 2008, voters approved a plan to facilitate light rail travel from Seattle, over Mercer Island, and into Bellevue (the east link). In 2009, the legislature budgeted $300,000 from the motor vehicle fund (MVF) for an appraisal of the center HOV lanes, which would be used for light rail. This appraisal was at issue in *Freeman v. Gregoire*, 171 Wn.2d 316, 323, 256 P.3d 264 (2011) (*Freeman* I). There, Freeman sought a writ of mandamus to bar WSDOT from converting the center lanes to light rail and to prevent MVF money from being expended for the lane valuation. *Id.* We denied the writ

because we found there was no mandatory duty for WSDOT to transfer the center lanes and because the valuation was a lawful expenditure for a highway purpose. *Id.* at 331.

Following the appraisal, WSDOT and Sound Transit negotiated a term sheet stating that Sound Transit would receive a 40 year lease of the air space over the center lanes. In exchange, Sound Transit would pay an amount equal to the State's share of the cost of the center roadway investment and the fair market rental value of the lanes as determined by the appraisal. The federal highway administration confirmed that the federal funds previously expended on I-90 need not be repaid if the lanes were used for light rail.

In 2011, WSDOT and Sound Transit signed a final "Umbrella Agreement" for the lease of the center lanes. CP at 1380. Under the agreement, Sound Transit would pay the State's 14.2 percent share of the cost of center roadway improvements (the two center lanes, the access and exit ramps, and other improvements) and the value of a 40 year lease, with an option to renew for an additional 35 years. Sound Transit also agreed to advance the amount needed to construct the replacement outer HOV lanes, which would be credited against the amount owed under the lease. The agreement states that the center lanes will not be "presently needed" when the new HOV lanes are open and that possession or control will not be transferred to Sound Transit until after the replacement HOV lanes are constructed and open to traffic, and other obligations are satisfied. *Id.* at 1383.

In November 2011, Washington voters rejected an initiative that would have prohibited WSDOT from transferring or using the center lanes for the east link light rail. Also that month, the federal transit administration issued a statement that the National Environmental Policy Act of 1969 (42 U.S.C. § 4321) requirements had been satisfied. The federal highway administration also issued a decision stating that because the center lanes will not be converted until after HOV lanes are added, "[t]here will be no net loss of HOV lanes." *Id.* at 1573.

The appellants filed the present challenge to the lease agreement seeking declaratory relief and a writ of mandamus in Kittitas County Superior Court. Sound Transit intervened. All parties filed cross motions for summary judgment. The trial court granted summary judgment in favor of WSDOT and Sound Transit.

## ANALYSIS

At issue is whether the lease between WSDOT and Sound Transit violates article II, section 40 and RCW 47.12.120. This court reviews the trial court's summary judgment order de novo. *Dowler v. Clover Park Sch. Dist. No. 400*, 172 Wn.2d 471, 484, 258 P.3d 676 (2011). "A summary judgment will be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

1. Article II, Section 40

Article II, section 40 requires that the MVF be used for highway purposes. *See State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 559, 452 P.2d 943 (1969). The relevant portion of article II, section 40 states:

> All fees collected by the State of Washington as license fees for motor vehicles and all excise taxes collected by the State of Washington on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes. Such highway purposes shall be construed to include the following:
> (a) The necessary operating, engineering and legal expenses connected with the administration of public highways, county roads and city streets;
> (b) The construction, reconstruction, maintenance, repair, and betterment of public highways, county roads, bridges and city streets; including the cost and expense of (1) acquisition of rights-of-way, (2) installing, maintaining and operating traffic signs and signal lights, (3) policing by the state of public highways, (4) operation of movable span bridges, (5) operation of ferries which are a part of any public highway, county road, or city street.

Here, the parties do not dispute that light rail is a nonhighway purpose. However, they disagree as to whether the MVF is implicated, in violation of the antidiversionary policy of article II, section 40 in the lease of lands pursuant to RCW 47.12.120. The relevant portion of RCW 47.12.120 provides:

> The department may rent or lease any lands, improvements, or air space above or below any lands that are held for highway purposes but are not presently needed. The rental or lease:
> (1) Must be upon such terms and conditions as the department may determine.

The appellants argue that article II, section 40 requires that highway facilities built and maintained using the MVF must continue to be used for highway purposes until "not presently needed" under RCW 47.12.120. In effect, the appellants suggest there is a constitutional mandate that highways constructed with the MVF continue to be used as highways. The appellants rely in part on *O'Connell*, 75 Wn.2d at 559, for this claim.

In *O'Connell*, we considered the constitutionality of using a MVF appropriation to fund studies incident to the preparation of a public transportation plan. *Id.* at 555. There, we stated that article II, section 40 is unambiguous and leads to the conclusion "that the people in framing this provision intended to insure that certain fees and taxes paid by them for the privilege of operating motor vehicles should be used to provide roads, streets and highways on which they could drive those vehicles." *Id.* at 559. We took judicial notice of the fact that "automobile drivers generally want more and better highways, leading to more places, rather than fewer." *Id.* at 561. The appellants rely on this language for the conclusion that because the lease would transfer two highway lanes, the constitution is violated. First, this argument ignores that two lanes on the outside will be added *before* Sound Transit takes possession of the two center lanes. There will be no net loss of lanes. Additionally, R-8A does not require an appropriation from the MVF, as in *O'Connell*. Rather, Sound Transit will provide the funds for light rail and reimburse the MVF for any previous MVF highway expenditures. Accordingly, *O'Connell* is unhelpful to appellants.

More importantly, article II, section 40 by its language does not protect highways. Rather, it protects certain taxes and revenues from uses other than highway purposes. Specifically, the amendment creates a fund and then limits the uses to which the fund may be put. Nothing in the language suggests the intent of the amendment was to protect the highways themselves.

The appellants rely on a 1944 voters pamphlet for their claim that the people intended highways in use to remain in use. The pamphlet characterizes article II, section 40 as "limiting exclusively to highway purposes the use of motor vehicle license fees, excise taxes on motor fuels and other revenue intended for highway purposes only" and expresses concern that tax money was diverted from highway improvements for other uses. *State of Washington Voters Pamphlet, General Election* 45 (Nov. 7, 1944), *available at* http://wsldocs.sos.wa.gov/library/docs/OSOS/voterspamphlet/voterspamphlet_1944_200 6_002278.pdf. Rather than supporting the appellants' attempt to constitutionalize highways, the pamphlet only reflects the people's desire to protect certain money for highway purposes by creating a dedicated fund; it does not address whether highway facilities must continue to be used for highway purposes.

The appellants note, though, that RCW 47.12.120 was enacted shortly after article II, section 40, suggesting the statute's requirements are a part of article II, section 40. However, the drafters of article II, section 40 could have easily included these

requirements, but did not do so. RCW 47.12.120 also makes no reference to article II, section 40.

The appellants also assert that article II, section 40 could be turned into a funding source for nonhighway purposes. The appellants opine that "MVF moneys could build a highway facility, but within days or months of its construction, WSDOT could turn the facility over to an entity for a non-highway purpose for 'consideration' and not violate the 18th Amendment." Br. of Appellants at 27. However, appellants' own statement acknowledges that consideration must be paid to the MVF, which satisfies article II, section 40. The management of the highways themselves is left to the legislature to determine, so long as the MVF is not expended on a nonhighway purpose.

While RCW 47.12.120 may have been adopted contemporaneously with the amendment, the appellants do not show the amendment was intended to incorporate the statute. Thus, while article II, section 40 requires that the MVF be used for highway purposes, it does not prohibit WSDOT from transferring highways built with the MVF where the MVF is reimbursed.

Our conclusion is supported by the opinion of the attorney general's office (AGO). While AGO opinions are not controlling, they are given great weight. *Thurston County ex rel. Bd. of County Comm'rs v. City of Olympia*, 151 Wn.2d 171, 177, 86 P.3d 151 (2004). Addressing the consideration necessary to allow the lease or sale of land previously acquired for highway purposes with MVF money, the AGO opined that the purchaser would need only to provide necessary consideration to prevent an unlawful

diversion of motor vehicle funds, and that such consideration need not be monetary or precisely equivalent to the fair market value. *See* 1975 Letter Op. Att'y Gen. No. 62, at 3, 1975 WL 165801, at *3.

Here, WSDOT plans to lease the highway facility to Sound Transit, pursuant to RCW 47.12.120. As consideration, Sound Transit will reimburse the MVF for the money spent by the State in constructing that portion of I-90, along with the fair market value of the lease. WSDOT will not expend money from the MVF on light rail, a nonhighway purpose. Because no money from the MVF is being expended on a nonhighway purpose, and any money that was previously expended from the MVF will be reimbursed, the language of article II, section 40 is not violated.

The appellants contend, however, that even if WSDOT could lease the center lanes, the MVF is not properly reimbursed through the lease. Specifically, the appellants argue the appraisal failed to include maintenance and replacement costs. The appellants do not cite authority demonstrating the valuation method applied was improper, nor provide evidence to support their claim that millions of MVF dollars were spent on maintenance. As for replacement costs, the federal government has agreed that the funds it provided need not be repaid. Because article II, section 40 only concerns "[a]ll fees collected by the State of Washington," WSDOT need only provide consideration for the cost to the MVF for constructing the center lanes in order to comply with the Constitution. Thus, article II, section 40 is not violated.[1]

---

[1] The dissent contends that MVF funds are at risk because WSDOT has promised to spend $44 million on the R-8A project. Dissent at 4. The dissent asserts that WSDOT would not otherwise

2. RCW 47.12.120

The appellants next contend the lease is not authorized under RCW 47.12.120 because the center lanes are "presently needed." As an initial matter, the appellants raise in a footnote the question of whether the lease at issue is actually a de facto sale, in which case RCW 47.12.080 would apply. This claim appears to rely on a statement made by the respondents during oral arguments in *Freeman* I that 40 years was the useful life of a structure under the Federal Transit Authority and Federal Highway Administration guidelines. The respondents noted that "no public entity is going to put millions or billions of dollars into a project if the Department can turn around the next day and terminate that."[2] The appellants in their brief do not cite to the guidelines referenced in the oral arguments of *Freeman* I. Additionally, even if the useful life of a structure is 40 years, the appellants do not explain why Sound Transit would have the option of renewing the lease for another 35 years. In light of the amount of funds invested in the project, and the absence of specific evidence supporting the appellants' claim, we conclude no de facto sale took place.

Turning to RCW 47.12.120, the appellants contend that the statute does not give WSDOT the discretion to determine whether the lanes are "not presently needed" and

---

spend this money but for the light rail construction. *Id.* However, the record reveals that the light rail construction simply afforded WSDOT an opportunity to implement R-8A, which was the preferred plan that focused on the nonrail transit lanes. More importantly, the appellants have not shown that these MVF funds will be used for the light rail construction. Thus, the appellants have not met their burden of showing a violation of article II, section 40.

[2] Wash. Supreme Court oral argument, *Freeman v. Gregoire*, No. 83349-4 (Sept. 16, 2010), at 32 min., 43 sec., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org.

that even if WSDOT has discretion under RCW 47.12.120, its determination is incorrect. Before addressing these arguments, it is important to consider the basis for this court's review.

First, this action is not reviewable under the Administrative Procedure Act (APA), chapter 34.05 RCW. Under the APA, an agency action "does not include an agency decision regarding . . . (c) any sale, lease, contract, or other proprietary decision in the management of public lands or real property interests." RCW 34.05.010(3). Because the "not presently needed" language falls under the leasing statute and is a "decision regarding" a lease under RCW 34.05.010(3), we must turn elsewhere for any authority to review WSDOT's determination.

Although review under the APA is unavailable, relief can be obtained through a declaratory judgment action. Under the Uniform Declaratory Judgment Act, "[a] person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. Accordingly, this court can review RCW 47.12.120 to determine whether WSDOT is authorized to make a determination of "presently needed."

Addressing their first argument, the appellants contend that while RCW 47.12.120 states WSDOT may lease lands presently not needed, it does not give WSDOT the discretion to determine *whether* such lands are presently needed. In support of this argument, they cite several rules of construction, including that the legislature "'says

what it means and means what it says'" and that the legislature is capable of expressly granting discretion to the department as it has done in other statutes and because such an expression is absent here, the legislature did not intend to give WSDOT discretion here. Reply Br. of Appellants at 33 (quoting *State v. Radan*, 143 Wn.2d 323, 330, 21 P.3d 255 (2001)). The appellants point to RCW 47.12.063 as a contrast to RCW 47.12.120, noting that RCW 47.12.063(2) states property may be sold "'[w]henever the department determines that any real property . . . is no longer required,'" whereas RCW 47.12.120 is silent on who determines whether property is "presently needed.'" *Id.* at 34 (quoting RCW 47.12.063(2)).

The appellants also cite to *Sperline v. Rosellini*, 64 Wn.2d 605, 392 P.2d 1009 (1964), which concerned a similar statute addressing the transfer of land. In *Sperline*, a declaratory judgment was sought seeking construction of a statute that stated:

> "The Washington State highway commission is authorized and directed to set aside or convey to the state parks and recreation commission so much of certain lands presently owned or to be acquired by the highway commission situated in Douglas county and lying along the eastern shore of the Columbia river, north of the community of East Wenatchee, as will not be required for highway purposes."

*Id.* at 605-06 (emphasis omitted) (quoting LAWS OF 1959, ch. 72, § 1). There, the commission did not declare lands surplus before seeking to transfer them. *Id.* at 606. The State argued that no declaration was necessary because the statute itself was a declaration the lands listed within were not required for highway purposes. *Id.* The court disagreed, construing the statute to require a determination that lands were not required for highway purposes. *Id. Sperline* does not suggest that the highway commission was

13

without the authority to make a determination of present need; rather, *Sperline* simply concluded that a determination was required under the statute. Such a determination was made here, as stated in the Umbrella Agreement: "upon the completion of the R8A Project and the completion of all the necessary obligations and actions identified in this Agreement and the exhibits attached hereto, the Center Roadway will no longer be presently needed for highway purposes." CP at 1382.

Conversely, the respondents argue that RCW 47.12.120 gives discretion to WSDOT. Specifically, the respondents assert that the department "may" lease lands and that lease is upon terms the department "may" determine. RCW 47.12.120. The respondents contend the statute is clear and discretion to determine whether highway land is "not presently needed" is necessary to carry out department discretion. This reading is consistent with RCW 47.01.260(1), which states that "[t]he department of transportation shall exercise all the powers and perform all the duties necessary, convenient, or incidental to the planning, locating, designing, constructing, improving, repairing, operating, and maintaining state highways."

Additionally, no statutes provide procedures for making these decisions, unlike in other statutes. *See, e.g.*, RCW 47.52.133-.195 (public hearing required to determine establishment of limited access facility); *State ex rel. Agee v. Superior Court*, 58 Wn.2d 838, 839, 365 P.2d 16 (1961). In *Agee*, a statute required a specific highway width "'unless the director of highways, for good cause, may adopt and designate a different width.'" 58 Wn.2d at 839 (emphasis omitted) (quoting REM. REV. STAT. § 6400-30).

14

The court determined that "good cause" was a discretionary decision left to the director because the legislature did not provide procedures for a public hearing, fact finding commission, or other procedure. *Id.* The appellants contend *Agee* differs because discretion was explicitly granted to the director by statute; however, whether this language afforded discretion was the entire point in *Agee*. Here, as in *Agee*, there are no statutes providing a procedure to determine "presently needed," suggesting discretion was meant to lie with WSDOT. Moreover, there are no statutes placing the discretion to make that decision with a different body or agency. If WSDOT does not have discretion and there is no other person or agency with discretion then lands could never be leased or transferred because there would be no determination that the land was "not presently needed."

In light of the broad authority granted to WSDOT to administer highways, and the lack of any statutory guidance suggesting otherwise, WSDOT is the appropriate entity to decide whether highway land is "presently needed."

The appellants next contend that even if WSDOT has discretion under RCW 47.12.120, its assessment was incorrect and should have been based on objective data. As discussed above, a sale or lease is not reviewable under the APA. However, the appellants believe that review of the constitution and statutes is authorized under the court's de novo review powers and that "'[i]t is emphatically the province and duty of the judicial department to say what the law is.'" Reply Br. of Appellants at 31 (internal quotation marks omitted) (quoting *In re Salary of Juvenile Dir.*, 87 Wn.2d 232, 241, 552

15

P.2d 163 (1976)). Appellants rely on *Heavens v. King County Rural Library District*, 66 Wn.2d 558, 560, 404 P.2d 453 (1965), where a declaratory action challenged the constitutionality of a statute authorizing local improvement districts for public libraries. Here, the appellants appear to be suggesting this is the proper vehicle because they are questioning "WSDOT's interpretation of its statutory authority without regard to the 18th Amendment." Br. of Appellants at 43. As noted above, RCW 47.12.120 is distinct from article II, section 40. While this court may be able to say "'what the law is,'" it is a different matter entirely to consider WSDOT's exercise of discretion under the law. *Juvenile Dir.*, 87 Wn.2d at 241 (internal quotation marks omitted) (quoting *United States v. Nixon*, 413 U.S. 683, 703, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974)).

The respondents argue for a narrow scope of review, contending this court can only consider whether its determination was "arbitrary and capricious or contrary to law." Br. of Resp'ts' State of Wash., Governor Gregoire & Sec'y Hammond at 21-22 (citing *Williams v. Seattle Sch. Dist. No. 1*, 97 Wn.2d 215, 221, 643 P.2d 426 (1982)). "'Arbitrary and capricious action has been defined as willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and capricious even though one may believe an erroneous conclusion has been reached.'" *Pierce County Sheriff v. Civil Service Comm'n*, 98 Wn.2d 690, 695, 658 P.2d 648 (1983) (quoting *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980)). The respondents argue this review exists under the court's inherent authority provided in article IV, section 6. *See Saldin Sec., Inc. v.*

*Snohomish County*, 134 Wn.2d 288, 292, 949 P.2d 370 (1998) ("The superior court has inherent power provided in article IV, section 6 of the Washington State Constitution to review administrative decisions for illegal or manifestly arbitrary acts.").

In arguing for this standard, the respondents analogize this case with other similar actions that do apply an arbitrary and capricious standard. For example, other acts under chapter 47.12 RCW, such as those relating to condemnation, do follow the arbitrary and capricious standard. *See State ex rel. Lange v. Superior Court*, 61 Wn.2d 153, 157, 377 P.2d 425 (1963) (administrative selection of lands is conclusive in the absence of bad faith, arbitrary, capricious, or fraudulent action); *State ex rel. Sternoff v. Superior Court*, 52 Wn.2d 282, 295, 325 P.2d 300 (1958) (considering whether the director of highways acted arbitrarily, capriciously, or fraudulently). Notably, RCW 47.12.010, a condemnation statute addressing acquisition of property, specifically states that actions can be brought where there is bad faith, arbitrary, capricious, or fraudulent action. The respondents argue that because condemnation deals with a determination of necessity, the same standard should also apply here.

In arguing for limited review, the respondents also cite to *Deaconess Hospital v. Washington State Highway Commission*, 66 Wn.2d 378, 406, 403 P.2d 54 (1965). In *Deaconess*, this court considered the Highway Commission's determination of where to place a freeway and said, "If the administrative agency has acted honestly, with due deliberation, within the scope of and to carry out its statutory and constitutional functions, and been neither arbitrary, nor capricious, nor unreasonable, there is nothing

left for the courts to review." *Id.* This court also observed, "That the courts may have reached a decision, made a choice or a conclusion different from that of the administrative agency, or taken wiser or more sensible action, does not empower them to do so." *Id.*

In determining how much deference is given to an agency decision, it is also helpful to consider that actions reviewable under the APA are subject to an arbitrary and capricious standard.

In light of the arguments of the parties, this court's history of reviewing administrative decisions, and the review afforded in other statutes dealing with necessity determinations, we will review WSDOT's determination under the arbitrary and capricious or contrary to law standard.[3]

Turning to the appellant's arguments that WSDOT's determination was incorrect, we first consider the appellants' claim that WSDOT failed to objectively determine whether the center lanes were needed prior to the transfer. The appellants assert that whether a highway is presently needed must relate to the need at that moment, not a point in the future. Accordingly, the appellants argue that WSDOT cannot lease the center lanes in the future because the lanes are currently in use and presently needed.

This argument ignores that possession and control of the center lanes will not be transferred to Sound Transit until *after* the center HOV lanes are replaced by outer HOV lanes. The lease is contingent upon this, at which point the lanes will not be "presently

---

[3] None of the parties challenge the court's authority to hear challenges to administrative decisions where review is unavailable under the APA.

needed" under RCW 47.12.120 because they will be replaced. As the federal highway administration noted, "[t]here will be no net loss of HOV lanes." CP at 1573. Furthermore, following the appellants' interpretation would severely limit WSDOT's authority to enter into contracts that may rely on future contingencies, such as in the present case.

The appellants also contend that the center lanes will still be needed after the replacement lanes are added. Initially, the appellants argue that 10 lanes are superior to 8, and that 10 lanes was the number under the original R-8A plan. However, without funding from Sound Transit there would be no additional lanes. Indeed, 10 lanes were never an option because the State lacked funds to implement such a plan. Additionally, the MOA limits I-90 to eight lanes.

Next the appellants and amici argue the facts do not support WSDOT's assessment that the lanes are not presently needed. The arbitrary and capricious or contrary to law standard requires more than a showing that WSDOT has erred; it requires that WSDOT acted willfully and unreasonably, without consideration and in disregard of facts and circumstances. In this case, WSDOT considered numerous studies and engaged in extensive planning, as identified in the Umbrella Agreement. Considerations included the "I-90 Two-Way Transit and HOV Operations FEIS [(Final Environmental Impact Statement)] and ROD [(Record of Decision)]; I-90 Two-Way Transit and HOV Access Point Decision Report; WSDOT I-90 Center Roadway Study; East Link FEIS and ROD; East Link/I-90 Interchange Justification Report; I-90 Bellevue to North Bend Corridor

Study; the WSDOT Highway System Plan 2007-2026, and the legislative history reflected in the 2009 Engrossed Senate Substitute Bill 5352, § 204(3) and § 306(17)." *Id.* at 1383. Taking all of the studies and historical materials into consideration, WSDOT executed its agreement with Sound Transit. A review of studies supports the respondents' contentions that WSDOT engaged in a careful evaluation of the need of the center lanes at the time of transfer.

To counter this evidence of extensive review, the appellants make several arguments that rely in part on documents and references Sound Transit sought to strike at the trial court and before this court. We passed Sound Transit's motion to the merits.

Among the documents Sound Transit seeks to exclude is an auditor's report addressing light rail ridership, which was published after the trial court decisions. Appellants included this document as an appendix to their reply brief. Under RAP 9.11(a), the court may direct that additional evidence on the merits be taken if six criteria are met:

> (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

Here, the auditor's report raises doubts about Sound Transit's ridership numbers for light rail. However, even assuming the ridership numbers are flawed as the auditor's report claims, the appellants provide no evidence to support their conclusion that the lane

transfer would negatively impact transit compared with the present lane configuration due to reduced ridership. In the absence of this evidence, the auditor's report is not needed to fairly resolve the issue, nor would it be inequitable to decide the case solely on the evidence already taken at trial. Additionally, the appellants inappropriately included this report in their reply appendix without indicating the report was not part of the record. *See Harbison v. Garden Valley Outfitters, Inc.*, 69 Wn. App. 590, 594, 849 P.2d 669 (1993).

Along with the auditor's report, Sound Transit seeks to exclude citations to articles not in the record, unsupported factual assertions in amici briefs, and related references. Sound Transit also moved to strike certain documents at the trial court level, including declarations it argued lacked foundation or were untimely and unauthenticated documents. The trial court denied the motion to strike, stating it reviewed the record "more with the intent on determining the legal issues as opposed to the collateral issues on some of the marginal information supplied." CP at 3194 n.5. After reviewing the evidence, we grant Sound Transit's motion to strike and reverse the trial court's denial of Sound Transit's motion and address the appellants' remaining arguments without considering these struck materials.

Appellants and amici argue that WSDOT's "not presently needed" determination was incorrect because peak traffic will lose a lane as a result of the lease. Currently, five lanes are available for peak traffic, and following the lease that number will indeed be reduced to four. However, traffic in the reverse direction will gain a lane, increasing

from three lanes to four. A 2004 study reveals a shift in inbound and outbound travel patterns, resulting in nearly equal volumes of traffic across Lake Washington in each direction during peak periods. Thus, while the peak direction may be losing a lane, the reverse direction will be seeing almost the same level of ridership and be gaining a lane.

The appellants and amici also make several other claims that primarily concern policy decisions. For example, amicus Save MI SOV raises a concern that Mercer Island residents could lose their present access to the center HOV lanes. While Mercer Island residents may be impacted by this lease, this does not violate the MOA, which provides that Mercer Island traffic needs are a lower priority than transit and carpools. Amicus Haney Truck Line LLC also argues that the trucking industry will be negatively impacted by the changed lane configuration. Whether or not this assertion is accurate, it is but one of many considerations and does not overwhelm the vast evidence that WSDOT's determination relied upon.

In this case, there is room for two opinions. While the appellants and amici may disagree with certain decisions and policy determinations, nothing suggests WSDOT did not consider the facts and circumstances in making its decision. We conclude that WSDOT's decision to lease the center lanes was not arbitrary and capricious or contrary to law.

The appellants seek common fund attorney fees at trial and on appeal, relying on *Weiss v. Bruno,* 83 Wn.2d 911, 914, 523 P.2d 915 (1974). In *Weiss,* we endorsed the recovery of reasonable attorney fees under the common fund principle where there was

"(1) a successful suit brought by petitioners (2) challenging the expenditure of public funds (3) made pursuant to patently unconstitutional legislative and administrative actions (4) following a refusal by the appropriate official and agency to maintain such a challenge." *Id.* Here, the appellants do not meet the first requirement because they did not bring a successful suit. Accordingly, we deny the appellants' request for attorney fees.

## CONCLUSION

We affirm the trial court's grant of summary judgment in favor of the respondents and deny the appellants' request for attorney fees. The lease of the two center lanes of I-90 to Sound Transit does not violate article II, section 40 or RCW 47.12.120.

No. 87267-8

_Madsen, C.J._

WE CONCUR:

_Stephens, J._

_Wiggins, J._

_Fairhurst, J._

_González, J._

_Gordon McCloud, J._

24

No. 87267-8

J.M. JOHNSON, J. (dissenting)—This court once again erodes the guaranties of the Washington State Constitution's 18th Amendment, which prevents the diversion of gas tax, vehicle registration, and related funds for nonhighway purposes. Constitutional amendments allow a concerned citizenry to bind future policymakers, preventing fleeting political designs from undermining our most deeply rooted principles. As the State's highest court, it is our sworn responsibility to safeguard all provisions of the constitution, including those that may appear inconvenient or politically unfavored. Here, the majority once again puts the motor vehicle fund (MVF) at risk of legislative and administrative pilfering for projects outside its constitutionally prescribed purposes. Moreover, the majority blatantly ignores the plain meaning of the words "presently needed" as they appear in RCW 47.12.120. I, therefore, dissent.

ANALYSIS

The 18th Amendment

The 18th Amendment to the Washington State Constitution, article II, section 40, was passed in 1944 with the intention of ensuring that motor vehicle funds (mostly gas tax, vehicle registration, and related funds) be used "exclusively" for highway purposes. The constitutionally required voters' pamphlet states "Between 1933 and 1943 in this state, in excess of $10,000,000 of . . . gas tax money was diverted away from street and highway improvement and maintenance for other uses." *State of Washington Voters' Pamphlet, General Election* 47 (Nov. 7, 1944). The purpose of the amendment is undeniable: the legislature had been using gas tax money and registration fees as a funding source for nonhighway, politically decided projects, and the voters sought to amend the constitution to "limit definitely the use of gasoline taxes and automobile registration fees to street and highway construction, maintenance and safety." *Id.*

The Washington State Constitution accordingly provides:

> All fees collected . . . as license fees for motor vehicles and all excise taxes collected . . . on the sale, distribution or use of motor vehicle fuel and all other state revenue intended to be used for highway purposes, shall be paid into the state treasury and placed in a special fund to be used *exclusively* for highway purposes.

2

CONST. art. II, § 40 (emphasis added).

The provision further enumerates specific authorized expenditures, none of which includes bus, train, light rail, or any other type of public transportation. *Id.* This court has since interpreted the amendment's use of the term "highway purposes" in *State ex rel. O'Connell v. Slavin*, 75 Wn.2d 554, 560, 452 P.2d 943 (1969). In that case, we held that public transportation is not a "highway purpose" under article II, section 40. It is accordingly well settled law that money cannot be diverted from the MVF for public transportation. *Id.* ("We are convinced that it was no more the intent of the framers to provide subsidies for the planning, construction, owning or operating of public transportation systems, however beneficial such a use of the funds might be to the state and its citizens.").

The respondents attempt to circumvent these clear restrictions on the use of the MVF by doing indirectly what they cannot do directly. The majority accepts their argument that the 18th Amendment is not implicated if the MVF is reimbursed by the entity buying or leasing the highway lands. However, this reasoning impermissibly transforms the MVF into a funding source for nonhighway purposes.

The "East Link" project, as currently contemplated, most certainly puts MVF funds at risk in violation of the 18th Amendment. Although the "R-8A" project would not be implemented but-for Sound Transit's East Link project, the record reflects that the Washington State Department of Transportation (WSDOT) has still promised to fund portions of the construction. For example, under the "umbrella agreement," WSDOT proposes to spend $44.4 million in funding for the R-8A project, which includes an estimated $10.5 million for construction of "dowel bar retrofits." Clerk's Papers (CP) at 1969. In other words, at least 44.4 million taxpayer dollars have been promised by the State to prepare the Interstate 90 (I-90) bridge for construction of the East Link project. Under *O'Connell*, any appropriation of money from the MVF to satisfy this obligation will run afoul of the 18th Amendment.

I also question whether Sound Transit's obligations under the umbrella agreement fully reimburse the taxpayers for the value of the center lanes when occupied by trains. Sound Transit's estimated payment of $165.7 million to fund the construction of the new HOV (high occupancy vehicle) lanes on the I-90 outer roadway will be credited against the amounts owed WSDOT for the light rail use of the center lanes. CP at 1969. In a

4

true arm's length lease, it is inconceivable that the modifications needed to make the property usable to the lessee, but which provide no benefit whatsoever to the lessor, would be credited against the rent due under the lease. It appears improper that the money paid by Sound Transit to replace the HOV lanes will be credited against its own rental obligations under the lease.

I further question the validity of relying on an attorney general opinion as the sole authority for the proposition that WSDOT can simply transfer highways to third parties for some nominal consideration. Although attorney general opinions are entitled to weight, they are not controlling. *Thurston County ex rel. Bd. of County Comm'rs v. City of Olympia*, 151 Wn.2d 171, 177, 86 P.3d 151 (2004). The majority's deference to WSDOT represents an unprecedented grant of power without even a modicum of oversight or process. It is this court's responsibility to thoroughly consider the constitutional issues at hand, including whether WSDOT may transfer highways built with MVF funds where the MVF is reimbursed. The majority improperly defers to the reasoning in the cited attorney general opinion, as well as WSDOT's expertise, without meaningfully engaging the

legal question at issue. *See* majority at 9; 1975 Letter Op. Att'y Gen. No. 62, 1975 WL 165801.

Under the respondents' analysis, although MVF funds could not be expended directly for a nonhighway purpose, WSDOT could use MVF funds to build a highway facility and then turn it over to an entity for a nonhighway purpose as long as some "consideration" was paid. There is no controlling precedent suggesting that our constitution may be stretched to make this permissible. Furthermore, in a feat of contractual sleight of hand, WSDOT and Sound Transit attempt to credit construction for the new HOV lanes against future rent payments for the center lanes. Finally, the State has agreed to contribute $44.4 million to further construction of the R-8A project, a payment which will most certainly violate the 18th Amendment if appropriated from the MVF. Here, the contractually contemplated transfer of the I-90 bridge center lanes violates the antidiversionary purpose underlying the 18th Amendment to our state constitution.

RCW 47.12.120

RCW 47.12.120 provides WSDOT with the statutory authority to lease highway lands. In other words, if the statutory criteria are not met, any contract to lease highway lands would be impermissible. RCW 47.12.120

provides, in part, "[WSDOT] may rent or lease any lands, improvements, or air space above or below any lands that are held for highway purposes but are not *presently needed*." (emphasis added). It has been well established that the center lanes to the I-90 bridge are highway lands that are "presently needed" under the statute. In fact, this point was conceded by WSDOT in discovery. CP at 2659 (WSDOT admitting: "Interstate 90 has been designated as a highway of statewide significance pursuant to RCW 47.06.140."); CP at 2664 (WSDOT admitting: "the existing two center lanes on Interstate 90 between Seattle and Bellevue Way are presently needed for highway purposes."). Thus, according to the plain meaning of the words "presently needed" as they appear in RCW 47.12.120, WSDOT may not contract to lease the center lanes of I-90 at a future date. Rather, a determination of whether highway lands are "presently needed" must be made contemporaneously with any contract to lease highway property.

The umbrella agreement between WSDOT and Sound Transit specifically notes that "upon the completion of the R8A Project and the completion of all the necessary obligations and actions identified in this Agreement . . . , the Center Roadway *will no longer be presently needed* for

7

highway purposes." CP at 1970 (emphasis added).[1] Because the statutory elements are a prerequisite to leasing highway lands, this statement is indispensible to the underlying agreement. If WSDOT cannot show that the lands are not presently needed, then the umbrella agreement cannot stand.

WSDOT's determination that the lanes will no longer be presently needed pursuant to RCW 47.12.120 is reviewed for whether the decision was "arbitrary, capricious or contrary to law." *Williams v. Seattle Sch. Dist. No. 1*, 97 Wn.2d 215, 221, 643 P.2d 426 (1982). The majority clings to this standard in order to defer to WSDOT. However, it is improper for us to abandon our responsibility to interpret the statute in question. "When interpreting a statute, our fundamental objective is to determine and give effect to the intent of the legislature." *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012) (citing *State v. Budik*, 173 Wn.2d 727, 733, 272 P.3d 816 (2012)). We first look to the statute's plain language. *State v. Velasquez*, 176 Wn.2d 333, 336, 292 P.3d 92 (2013). "If the plain language is unambiguous, subject only to one reasonable interpretation, our inquiry ends. A statute is not ambiguous merely because multiple interpretations are conceivable." *Id.* (citation omitted). Here, the majority improperly defers to

---

[1] Nor is there explanation of the loss of vehicle capacity during the years' long construction period.

WSDOT's RCW 47.12.120 determination without first interpreting the meaning of the words at issue in this case: "presently needed." We should, instead, interpret those words, then apply the meaning to the facts, determining whether WSDOT's actions were "arbitrary, capricious or contrary to law." *Williams*, 97 Wn.2d at 221.

"When a statutory term is undefined, the words of a statute are given their ordinary meaning, and the court may look to a dictionary for such meaning." *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). "[P]resently" is defined as "at the present time : at present : at this time : NOW . . . : immediately." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1793 (2002). "[N]eeded" is defined as "be necessary . . . : REQUIRE . . . : be under necessity or obligation to." *Id.* at 1512. Thus, WSDOT is only authorized to lease highway lands that are unnecessary for highway purposes now—not at some point after the construction of the outer HOV lanes. At this moment in time, the center HOV lanes are both necessary and regularly used by the public. In fact, it is difficult to imagine any property in the entire state of Washington that is needed for highway purposes more than the two center lanes of the I-90 bridge during any daily rush hours. Furthermore, WSDOT already conceded that the lanes are

9

presently needed for highway purposes. CP at 2664. Any determination that the lanes are not presently needed for highway purposes is clearly arbitrary and capricious.

The majority accepts WSDOT's position that it can enter into a contract to lease the center lanes even though the contract is predicated on the assertion that the center lanes will no longer be needed after construction of the outer HOV lanes. However, those outer lanes would never exist but-for the underlying contract, which includes a promise to lease and transfer the center lanes upon completion of the outer lanes. Through the circularity of the contract, WSDOT and Sound Transit attempt to excise the words "presently needed" from RCW 47.12.120. The majority effectively endorses these legal gymnastics.

It is irrelevant that possession and control will not be transferred to Sound Transit until the replacement HOV lanes are complete and operational. The umbrella agreement is itself unlawful, indeed unconstitutional, and should be held void. It is well settled law in Washington that contracts that are illegal or violative of public policy are unenforceable. "If a contract is illegal, our courts will leave the parties to that contract where it finds them." *Golberg v. Sanglier*, 96 Wn.2d 874, 879,

10

639 P.2d 1347, 647 P.2d 489 (1982) (citing *State v. Nw. Magnesite Co.*, 28 Wn.2d 1, 26, 182 P.2d 643 (1947)). Contracts which "grow[] immediately out of and [are] connected with an illegal act" are similarly unenforceable. *Id.* (citing *Waring v. Lobdell*, 63 Wn.2d 532, 533, 387 P.2d 979 (1964)). Here, WSDOT's decision to enter into the umbrella agreement was arbitrary and capricious given a proper interpretation of the words "presently needed." Because ,it is predicated on an unlawful action—WSDOT's untimely determination of present need under RCW 47.12.120—the umbrella agreement is void. Accordingly, the arrangement between WSDOT and Sound Transit to build the outer HOV lanes and ultimately transfer the center lanes to Sound Transit for the East Link project is unlawful.

CONCLUSION

The majority again turns a blind eye to the subversion of the 18th Amendment's antidiversionary purpose, which assures the payers of gas taxes and vehicle registration fees that they receive full highway value for their money. Furthermore, the majority refuses to engage in meaningful statutory interpretation of the term "presently needed," preferring instead to defer to WSDOT's own illogical use of the term: that the department can say with certainty in this moment whether or not a specific parcel of highway

11

land will be "presently needed" at a date years in the future. The absurdity of this assertion will further destroy the trust in government promises to our citizens whose gas taxes and registration fees will now be accessible for nonhighway projects through elaborate contracts and back room agency agreements.